**UNITED STATES of America**

v.

**Thomas Clyde McQUAGGE, Jr., Karl Briceland McCurdy and Don Overton Mallory.**

**No. 6:91 CR 57.**

United States District Court,
E.D. Texas,
Tyler Division.

Dec. 9, 1991.

As Amended March 9, 1992.

638

Jim Middleton, Tyler, Tex., for plaintiff.

Dale Long, Jeff Baynham, Tyler, Tex., Webb Baird, Paris, Tex., for defendants.

## AMENDED MEMORANDUM OPINION

JUSTICE, District Judge.

Defendants, Thomas Clyde McQuagge, Jr. and Karl Briceland McCurdy, have moved to suppress evidence, arguing that it was obtained in violation of their Fourth Amendment rights, because the evidence obtained was the fruit of an illegal arrest. In addition, defendant McCurdy has moved to suppress statements made to a law enforcement officer, as obtained in violation of his fifth amendment right against self-incrimination. Hearings were held on these motions on October 22, 1991 and October 28, 1991.[1] For the reasons discussed below, the motions will be granted, in part.

1. The Court is aware that after an earlier hearing, held on September 3, 1991, Magistrate Judge Harry W. McKee ordered defendants detained. Conceivably, evidence may have been presented at that hearing which would be relevant to this motion. However, neither party has asked the court to consider the evidence presented at that hearing, nor has either party moved to make the transcript of that hearing a part of the record. In the absence of a contrary request from the parties, it is found that it would not be in the interest of justice for the court to review the proceedings of that hearing. The case was not referred to the magistrate

## I. *Facts*

The basic facts relevant to the motions are summarized below; greater detail is provided in the remainder of the opinion. In the late evening and early morning hours of August 26 and August 27, 1991, officers of the Van Zandt County Sheriff's Department and Drug Enforcement Agency (DEA) task force stopped the defendants' van and arrested them, following a night-long surveillance of the defendants on rural premises in Van Zandt County, Texas. Subsequent to the arrest, the officers seized evidence from the van. The officers then took the defendants back to the same premises they had previously left, where the officers waited for a search warrant. On the basis of this evidence, as well as certain other information gathered from the surveillance, an affidavit was submitted to United States Magistrate Judge Judith Guthrie, who issued a search warrant at approximately 11:05 a.m., on August 27, 1991, to search the van, the rural premises, and another van that was on the property. At approximately 10:30 a.m., defendant McCurdy was taken to the Van Zandt County Sheriff's Department by Deputy Corbett Goth. En route, McCurdy made certain statements he now seeks to suppress.

## II. *Burden of Proof*

▪ The heart of the defendants' contentions is that the officers arrested the defendants without probable cause. Consequently, they argue, all evidence and statements thereafter acquired must be suppressed as the fruit of the illegal arrest. It is uncontested that the police had no warrant when they stopped the van.

Hence, the government bears the burden of proving that the stop of the van and the subsequent detention of the defendants were constitutional. *United States v. De La Fuente*, 548 F.2d 528, 533 (5th Cir.), *cert. denied*, 431 U.S. 932, 97 S.Ct. 2640, 53 L.Ed.2d 249, and *cert. denied*, 434 U.S. 954, 98 S.Ct. 479, 54 L.Ed.2d 312 (1977); 4 La Fave, *Search and Seizure* § 11.2(b), at 218 (2nd ed. & Supp.1991).[2]

## III. *The Stop of the Blue Ford Van*

### A. Factual Background

In the late evening of August 26, 1991, and early morning of August 27, 1991, agents of the DEA Task Force conducted surveillance of certain rural property in Van Zandt County, owned by Don Mallory. Throughout the evening and early morning hours, the agents observed defendants McQuagge and McCurdy working around a silo located on the property and loading material into the two vans that were parked on the property. The agent in charge, DEA Task Force Agent Paul Black, testified that, by two o'clock, he concluded that he had probable cause to arrest the defendants. He then requested back-up units from the Van Zandt County Sheriff's office and the DEA task force in Tyler and ordered them to arrest the defendants when they left the property.[3] At approximately 4:15 a.m., the defendants got in the blue Ford van and left the property. Backup units promptly stopped the van and apprehended the defendants on the road, two or three miles from the property. Agent Black specifically testified that at

---

judge for him to make a recommendation on the motion to suppress. *See United States v. Raddatz*, 447 U.S. 667, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980). The detention hearing dealt with a different issue, the parties would not have reasonably been aware that the court would make use of the hearing for the purposes of ruling on the motion to suppress, and the magistrate judge did not make findings regarding the legality of the police conduct at issue here. Accordingly, consideration of this motion will be limited to the evidence and testimony placed in the record at the hearings held on these motions.

**2.** Because the subsequent searches were conducted in accordance with a search warrant, the defendants have the ultimate burden of persuasion with regard to the validity of the warrants. *United States v. Marx*, 635 F.2d 436 (5th Cir. 1981); *De La Fuente*, 548 F.2d at 533; 4 La Fave, § 11.2(b), at 218.

**3.** Agent Black testified that he ordered the arrest forty-five minutes to an hour before the van left.

the time that the van was stopped, he had no reason to suspect that the defendants were carrying weapons.[4]

Agent Black, the only officer who testified at the suppression hearing concerning the arrest, was not present at the time that the stop occurred, but arrived a few minutes later. Consequently, the following account of the stop is drawn from the testimony of the defendants.

In their testimony, the defendants asserted that several vehicles appeared on the road suddenly, forcing the defendants to drive their vehicle off the road. At least eight to ten officers appeared,[5] with guns drawn, and "were yelling and screaming" at the defendants to get out of the van and to lie face down on the ground. At that juncture, the defendants immediately got out of the van, and lay face down on the ground a few feet from the van. The defendants could see the officers pointing guns, including shotguns, at them. A few minutes after lying down, the defendants were handcuffed. Because the defendants' testimony was credible, and the government introduced no evidence to rebut it, the defendants' account of the circumstances relating to their seizure is adopted, and it is found that the stop of the van occurred as the defendants described it.

At the time DEA Agent Black ordered the van stopped, the officers were aware of the following relevant facts. First, at an earlier date, a "cooperating individual" had told Agent Dan Easterwood, of the Texas Department of Public Safety Narcotics Service, that there was a strong chemical smell coming from the Mallory property, and that Mallory had been doing a lot of work on the property. On July 9, 1991, Agent Easterwood conducted covert surveillance at the Mallory property, and observed an air conditioner attached to the westernmost silo, one of the three silos on the property. Easterwood, who has an agricultural background, concluded that the only reason that one would have an air conditioner in a silo would be for human comfort. On July 31, 1991, Agent Dan Easterwood and Officer Rick Easterwood, of the Texas Department of Public Safety, again conducted surveillance on the property. This time, the officers observed at least two persons working in and around the west silo. The officers also observed interior lighting in the silo and could hear banging and the sound of power tools coming from the barn and the silo area.

Finally, on August 26, 1991, Agents Paul Black, Rick Cheek, Harold Jones, and John Miller conducted surveillance at the Mallory property. Agents Cheek, Jones, and Miller walked to within listening distance and observed defendant McQuagge carry what appeared to be a triple neck boiling flask out of the silo and place it in the blue GMC conversion van. The defendants also loaded boxes and three large drums into one of the vans, and carried what appeared to be a single neck boiling flask to the silo. In addition, the Officers observed a fire extinguisher in the silo, and a water tank attached thereto. Further, the officers overheard the defendants talking about reducing the size of the pipe, so that they could use it for the wash. All of the above information was included in the affidavit for a search warrant that was submitted to Magistrate Guthrie on August 27, 1991.

### B. Was the Seizure of the Defendants An Arrest or a *Terry* Stop?

 The stop of the van was a "seizure"

Agent Black: "I'm sorry. When the vehicle was stopped?"
Counsel: "Yes Sir."
Agent Black: *"No. I did not at that point."*

---

**4.** This information was elicited on examination by counsel for the government.
Counsel: "When the vehicle was stopped, did you have in your mind reasonable suspicion that may indicate that the individuals in that moving vehicle in fact were in possession of fire arms?"
Agent Black: "Yes I did."
Counsel: "And specifically what information did you have that would make you think these individuals had firearms?"

**5.** Defendant McQuagge testified that there were eight to ten officers. Defendant McCurdy testified that there were fifteen to twenty officers.

for Fourth Amendment purposes.[6] *Michigan v. Sitz*, 496 U.S. 444, 110 S.Ct. 2481, 2485, 110 L.Ed.2d 412 (1990). The standard to be used in determining whether the seizure was permissible depends on whether it was an arrest or an investigative stop authorized by *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). If the halt of the van and the subsequent police conduct was an arrest, then it must have been supported by probable cause. *Wong Sun v. United States*, 371 U.S. 471, 479, 83 S.Ct. 407, 412, 9 L.Ed.2d 441 (1963). If it was a *"Terry* stop," however, it need only have been supported by reasonable suspicion that the occupants were involved in criminal activity. *United States v. Hensley*, 469 U.S. 221, 226, 105 S.Ct. 675, 679, 83 L.Ed.2d 604 (1985); *United States v. Brignoni–Ponce*, 422 U.S. 873, 881, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975).

■ A *Terry* stop is a brief investigative stop or detention, made for the purpose of verifying or dispelling a law enforcement officer's suspicion of criminal activity. *United States v. Sharpe*, 470 U.S. 675, 686, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985); *Berkemer v. McCarty*, 468 U.S. 420, 439, 104 S.Ct. 3138, 3149, 82 L.Ed.2d 317 (1984). A *Terry* stop is an exception to the general rule that a seizure must be supported by probable cause. *Dunaway v. New York*, 442 U.S. 200, 211–12, 99 S.Ct. 2248, 2255–56, 60 L.Ed.2d 824 (1979). The exception is justified, because the *Terry* stop involves a substantially lesser intrusion than that associated with an arrest, and because the investigatory stop or detention, and the protective frisk and similar police practices that accompany it, are necessary to effective police work and to protecting the safety of the police and the public. *Dunaway*, 442 U.S. at 212, 99 S.Ct. at 2256; *Terry*,

392 U.S. at 22–24, 88 S.Ct. at 1880–81. This rationale mandates that the use of force in a *Terry* stop be confined to that which is reasonably necessary under the circumstances. Conversely, if the police were permitted to use force which is generally associated with an arrest, then the *Terry* "exception" would swallow the rule that an arrest must be accompanied by probable cause. *Dunaway*, 442 U.S. at 213, 99 S.Ct. at 2257. The Court has therefore required that the officer's actions in executing a *Terry* stop should be no more "intrusive than necessary to effectuate an investigative detention." *Florida v. Royer*, 460 U.S. 491, 504, 103 S.Ct. 1319, 1328, 75 L.Ed.2d 229 (1983). *See also United States v. Sharpe*, 470 U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605 (1985); *Hensley*, 469 U.S. at 235, 105 S.Ct. at 683; *United States v. Zukas*, 843 F.2d 179, 182 (5th Cir.1988).

An arrest, by contrast, involves "the types of restrictions on liberty imposed by formal custody." *United States v. Hernandez*, 825 F.2d 846, 851 (5th Cir.1987). While the Supreme Court has not clearly delineated the boundary between an arrest and a *Terry* stop, the Court has made clear that a *de facto* arrest requiring probable cause may occur, even where the police do not formally place the defendant under arrest. *Sharpe*, 470 U.S. 675, 105 S.Ct. 1568; *Dunaway*, 442 U.S. at 212, 99 S.Ct. at 2256.

■ To determine whether the police conduct in this case was an arrest or a *Terry* stop, therefore, an analysis must be made to resolve whether "a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *United States v. Corral–*

---

**6.** The Supreme Court has held that a seizure occurs if "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Michigan v. Chesternut*, 486 U.S. 567, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980)). In addition, the Court indicated during its last term that a seizure occurs, if the peace

officers apply physical force, or make a show of authority to which the defendant yields. *California v. Hodari D.,* —— U.S. ——, 111 S.Ct. 1547, 1551, 113 L.Ed.2d 690 (1991). Here, the conduct of the peace officers in forcing the defendants off the road, ordering them out of the car, making them lie on the ground, and then handcuffing them unquestionably was a seizure within the meaning of the Fourth Amendment.

*Franco,* 848 F.2d 536, 540 (5th Cir.1988) (quoting *United States v. Bengivenga,* 845 F.2d 593, 596 (5th Cir.1988)). Because the test is objective, and depends upon a reasonable person's perception of the circumstances, the determination of whether an arrest or a *Terry* stop occurred "depends upon an evaluation of the testimony of those who were present at the time." *United States v. Worthington,* 544 F.2d 1275 (5th Cir.1977), *cert. denied,* 434 U.S. 817, 98 S.Ct. 55, 54 L.Ed.2d 72 (1977). Furthermore, the government bears the "burden to demonstrate that the seizure it seeks to justify on the basis of reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." *Royer,* 460 U.S. at 500, 103 S.Ct. at 1326 (plurality opinion).

Applying the above test, it is found that the seizure of the defendants was an arrest, rather than a *Terry* stop, and that the government has not met its burden of proving that the force used was reasonably necessary to effect a *Terry* stop. In this case, the unrefuted testimony of the defendants was to the effect that they were forced off the road, that they were ordered to lie on the ground face down, that they were handcuffed, and that guns were pointed at them as they lay on the ground. These restraints are those "which the law associates with formal arrest." *Corral–Franco,* 848 F.2d at 540.

The lower federal courts consistently have held that police conduct similar to that present in this case constitutes an arrest, in the absence of some showing by the government that the restraints used were necessary to protect the safety of the officers or the public. *United States v. Del Vizo,* 918 F.2d 821, 825 (9th Cir.1990) (drawing weapons on a cooperative suspect, ordering him out of this vehicle and to lie prone on the street and handcuffing him was an arrest, even though the officer did not state that the defendant was under arrest); *United States v. Delgadillo–Velasquez,* 856 F.2d 1292, 1295 (9th Cir.1988)

(arrest occurred where agents approached with their weapons drawn, cried halt, and required the defendants to lie face down in the street while they were handcuffed); *United States v. Whitlock,* 418 F.Supp. 138, 142–43 (E.D.Mich.1976), *aff'd,* 556 F.2d 583 (6th Cir.1977) (defendant under arrest when agents blocked defendant's vehicle, handcuffed him, and confiscated his billfold and keys); *United States v. Solomon,* 728 F.Supp. 1544, 1547 (S.D.Fla.1990) (stop of the defendants as they were driving was an arrest, and not merely a *Terry* stop, where the vehicle was surrounded by the police vehicles, and forced off the road, the defendants were required to get out of the car and lie on the ground while facing three drawn guns, and were then handcuffed and detained in police cars).

In addition, the Seventh Circuit has held that handcuffing a defendant at a roadside stop necessarily constitutes an arrest, unless, "in a rare case," the officers reasonably believed that an investigative stop can only be safely effected with the use of handcuffs.[7] *United States v. Glenna,* 878 F.2d 967, 972 (7th Cir.1989) ("handcuffs are restraints on movement normally associated with arrest. Clearly, the thought of allowing police officers to handcuff persons where probable cause to arrest is lacking is a troubling one"). *See also United States v. Galberth,* 846 F.2d 983, 988 (5th Cir. 1988) (holding that fifteen minute to twenty minute stop of car was *Terry* stop, and not arrest, where *"defendants were not handcuffed* or placed in a squad car") (emphasis added). Courts have also found conduct less intrusive than that present here to constitute an arrest. *United States v. Novak,* 870 F.2d 1345, 1352 (7th Cir.1989) (arrest occurred where nine police officers surrounded two defendants and one officer pointed a gun at one of them); *United States v. Ceballos,* 654 F.2d 177, 184 (2d Cir.1981) (defendant arrested when car was blocked and several officers approached him with guns drawn and ordered him to

---

**7.** The court proceeded to find that the handcuffing was permissible, as part of a *Terry* stop, because the police received a report on the police teletype that defendants were in posses-

sion of several small weapons and an explosive device, and a loaded clip was found on the defendant. *Glenna,* 878 F.2d at 973.

get out of the car); *United States v. Birdsong,* 446 F.2d 325 (5th Cir.1971) (defendant under arrest when agents ordered him out of his car, surrounded him, and took the key from the ignition). Finally, the fact that there were several police cars and at least eight to ten officers present is indicative of an arrest, because a reasonable person would perceive that such a large number of officers were present to place him in custody, rather than to question him. *United States v. Thompson,* 906 F.2d 1292, 1296 (8th Cir.1990) (number of officers and police cars involved is factor to be used in determining whether the use of force constituted an arrest), *cert. denied,* —— U.S. ——, 111 S.Ct. 530, 112 L.Ed.2d 540 (1990).

In light of these facts, it is clear that a reasonable person in the position of the defendants would have thought they were under arrest, rather than being subjected to a brief investigatory detention. The defendants were therefore placed under arrest when the van was stopped, and they were ordered to lie down, and were then handcuffed.

The force used in this case might be justified as part of a *Terry* stop, if there had been reason to believe that the defendants were dangerous and the government demonstrated that the means employed were reasonably necessary to protect the safety of the police officers or the public. *E.g. United States v. Hemphill,* 767 F.2d 922 (6th Cir.) (unpublished disposition) (police officers stopped two cars simultaneously and police dispatch indicated one of the occupants was armed and dangerous), *cert. denied,* 474 U.S. 982, 106 S.Ct. 388, 88 L.Ed.2d 340 (1985), cited in *United States v. Hardnett,* 804 F.2d 353, 358 n. 2 (6th Cir.1986); *Dempsey v. Town of Brighton,* 749 F.Supp. 1215, 1223–24 (W.D.N.Y.1990) (suspect matched description of person who had just robbed bank, bank robber had told

teller he had a gun, and suspect was yelling and thrashing about on the ground). The Fifth Circuit also has upheld the use of considerable force in a *Terry* stop, where there was a reason to believe that the defendants presented a danger to the police or the public. *E.g. United States v. Campbell,* 942 F.2d 890, 892 (5th Cir.1991) (it was permissible *Terry* stop for police officer to pull the defendant out of the car, throw him down to the ground, and pat him down for weapons, after a high speed chase which ended where the defendant collided with the agent's car, and the officer testified that he was afraid that the defendant would attempt to escape by running an agent over with his truck); *United States v. Ullrich,* 580 F.2d 765, 769 (5th Cir.1978) (where defendant had not responded when asked for identification, and then reached for glove compartment with one hand and under seat with other hand, and officer, who was alone, perceived the action as threatening, it was reasonable for officer to remove the defendant from the automobile, frisk him, handcuff him, and place him in the back seat of the car, while he checked the front seat for weapons).[8] However, where the government fails to demonstrate that the intrusive behavior that would otherwise constitute an arrest was necessary to effect a *Terry* stop, the courts find an arrest occurred. *Del Vizo,* 918 F.2d at 825; *Novak,* 870 F.2d at 1352; *Ceballos,* 654 F.2d at 184.

In this case, the government made no showing whatsoever that the facts observed by the officers created an objective reasonable suspicion that the defendants were dangerous. Agent Black testified that at the time that the van was stopped, he did not have reasonable suspicion that the defendants were carrying weapons. The testimony indicates the defendants promptly got out of the vehicle and lay

---

**8.** *See also United States v. Laing,* 889 F.2d 281, 286 (D.C.Cir.1989) (proper to force defendant to floor and force his hand out of his pocket, where defendant ran toward apartment for which police had search warrant for drugs and guns, put his hand in his pocket, and refused to lie down), *cert. denied,* 494 U.S. 1008, 110 S.Ct. 1306, 108 L.Ed.2d 482 (1990), and *cert. denied,* 494 U.S. 1069, 110 S.Ct. 1790, 108 L.Ed.2d 792 (1990); *United States v. Taylor,* 716 F.2d 701, 709 (9th Cir.1983) (proper for officers to handcuff the defendant and force him to lie on the ground where defendant "had disobeyed an order to raise his hands and ... made furtive gestures").

down. There was no evidence that the defendants attempted to flee or to drive away. Furthermore, the officers who made the stop failed to testify, and the government produced no evidence indicating the defendants had made any furtive gestures or suspicious movements that would have made the arresting officers think the defendants were not complying with their commands or presented a danger. On this record, the government has failed to carry its burden of proving that force used against the defendants was reasonably necessary to effect a *Terry* stop.

Any argument that the actions of the peace officers would be necessary to effectuate a *Terry* stop if the officers had reasonable suspicion that the defendants were involved in manufacturing illegal drugs also is unavailing. The fact that a defendant is suspected of illegal drug activity may authorize certain minimal displays of force and precautions that are otherwise not part of a *Terry* stop. *E.g. United States v. Lechuga*, 925 F.2d 1035, 1040 (7th Cir.1991) (reasonable for officer to draw gun when approaching defendant's vehicle where officer had reasonable suspicion that defendant was involved in a narcotics transaction). However, there is no support for the idea that reasonable suspicion that a defendant is violating the drug enforcement laws, standing alone, authorizes measures that are synonymous with an arrest. *Del Vizo*, 918 F.2d at 825 (officers' suspicions that defendant was involved in drug trafficking did not authorize officers to draw weapons, order suspect to get out of the car and lie on the ground, and handcuff him); *Ceballos*, 654 F.2d at 184 (fact that officers suspected defendant of being involved in narcotics trafficking did not justify blocking progress of car and approaching car with guns drawn). To permit law enforcement intrusions that are indistinguishable from those associated with an arrest on mere reasonable suspicion that a suspect is involved in illegal narcotics, would effectively authorize arrest upon reasonable suspicion for any crime involv-

ing narcotics. *Ceballos*, 654 F.2d at 184. Such a rule cannot be tolerated, as it "would threaten to swallow the general rule that Fourth Amendment seizures are 'reasonable' only if based on probable cause." *Dunaway*, 442 U.S. at 213, 99 S.Ct. at 2257.

**C. Was There Probable Cause to Arrest the Defendants?**

■ Because the arrest was accomplished without a warrant, the government bears the burden of proving that the arrest was supported by probable cause. *De La Fuente*, 548 F.2d at 533; *Manuel v. United States*, 355 F.2d 344, 346 (5th Cir.1966); *Rogers v. United States*, 330 F.2d 535, 542–43 (5th Cir.1964) *cert. denied*, 379 U.S. 916, 85 S.Ct. 265, 13 L.Ed.2d 186 (1964). At the time that the van was stopped, the arresting officers were aware of the first informant's tip regarding the chemical smell, and the observations based on three surveillances of the Mallory property. All of this information can be considered in determining whether there was probable cause. The first informant's tip, though it is not accompanied by any indication of truthfulness or reliability, may be considered as part of the totality of the circumstances. *Alabama v. White*, 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990); *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). The information regarding what the DEA agents saw and heard at the property may also be considered. It is unclear from the affidavit whether the agents were on or off the property during the July 7, and July 31, 1991, surveillance.[9] Even if the officers had trespassed onto the Mallory property, however, the surveillance would not violate the fourth amendment. *United States v. Dunn*, 480 U.S. 294, 303–05, 107 S.Ct. 1134, 1140–41, 94 L.Ed.2d 326 (1987); *Oliver v. United States*, 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984).

■ It is also found that there is no reason to doubt the veracity of the account

---

**9.** Agent Black testified that the officers were positioned on the other side of the west fence outside the Mallory property during the August 26–27, 1991 surveillance. However, Officer Black was not with the officers, although he was in radio contact with them.

of the surveillance activities that was contained in the affidavit. "There is a presumption of validity with respect to the affidavit supporting the search warrant." *Franks v. Delaware,* 438 U.S. 154, 171, 98 S.Ct. 2674, 2684, 57 L.Ed.2d 667 (1978). In order to overcome that presumption, the defendant must show, by a preponderance of the evidence, that the affiant has included a false statement in the affidavit deliberately, or with reckless disregard of the truth. *Franks,* 438 U.S. at 156, 98 S.Ct. at 2676. "Allegations of negligence or innocent mistake are insufficient." 438 U.S. at 171, 98 S.Ct. at 2684.

Defendants failed to make the required showing at the hearing. Defendants argued it would be impossible for police officers to have seen what they claimed to have seen in the dark from a distance. However, the defendants' own map of the area indicated that the officers would at most have been 268 feet from the silos. Defendant McCurdy testified on direct examination that the fire extinguisher could "possibly" have been seen from the outside when the door was open. In addition, defendant McQuagge admitted carrying a flashlight, and the silo, the door to which was occasionally open, had inside lighting.

Defendants also argued that the police officers could not have overheard the defendant's conversations from where they were positioned. Defendant McCurdy testified they were speaking at a normal volume. In support of this argument, the defendants offered the testimony of a private investigator, Robert Phillips, who testified that he had surveyed the property and that he had conducted sound tests in the past. When asked on direct examination whether he thought that the officers could have heard two people conversing near the silo from the west fence, Phillips replied, "I wouldn't think so." However, Phillips admitted on cross-examination that he had not conducted a sound test at the property, and that he had not gone to the property in the early morning, to get a sense of whether there were other sounds in the area at the time. In addition, Agent Black testified that it was a very still night. In light of the above considerations, it is

found that the defendants have not demonstrated that the claim that the officers could hear the defendants talking was deliberately false.

Finally, the defendants indicated that the statement that the officers had observed McQuagge carrying "what appeared to be" a triple-neck boiling flask was false, because no triple-neck boiling flask was found. However, the search of the Blue GMC van turned up at least two single neck boiling flasks and several other flasks. The officers conceivably could have mistaken one of these flasks for a triple-neck flask. Defendants, therefore, have not shown that the statement that McQuagge was carrying "what appeared to be" a triple neck boiling flask was deliberately false.

DEA Agent Black also testified that "somewhere [sic] in the week of August 26th," he received a call from the Kaufman County Sheriff's office, stating that an informant had told them that he had taken a hitchhiker to the Mallory property, and that the hitchhiker bragged about an amphetamine lab in a grain silo. This tip will not be considered in determining whether there was probable cause to arrest the defendants. Unlike the rest of the information recounted above, the statement of Kaufman County tipster was not included in the affidavit submitted to Magistrate–Judge Guthrie. Agent Black testified he did not include this information in the affidavit, because by this time, he had more reliable evidence obtained from the van and did not think that he needed the tip. This explanation is unconvincing. The tip, while it lacked any indication of truthfulness or reliability, explicitly linked the Mallory property to criminal activity. It was potentially more incriminating, for example, than the first informant's tip, that was included in the affidavit. It is difficult to believe that Agent Black would have left the Kaufman County tip out of the affidavit, if he had been aware of it at the time. More importantly, Agent Black testified he received the tip "somewhere [sic] in the week

of August the 26th".[10] This testimony does not clearly indicate that Agent Black was aware of the tip at the time that the van was stopped. Indeed, because the surveillance took place on the night of August 26, 1991, Agent Black's statement indicates that he probably received the tip after the surveillance. In light of the above facts, it is found the government has not met its burden of proving that Agent Black was aware of the Kaufman County tip at the time he ordered the van stopped, and that the tip was probably received afterwards. The tip therefore will not be considered in determining whether or not the police had probable cause to arrest the defendants.

■ To summarize, it is found that at the time that Agent Black ordered the defendants arrested, the officers were aware of the following facts: 1) that an informer had stated that there was a strong chemical smell on the Mallory property; 2) that the silo had been equipped with an air conditioner and a water tank; 3) that persons had been working around the silo and using power tools; 4) that the defendants had been carrying boiling flasks on the property; and 5) that the defendants had been talking about a pipe and a wash. These facts, standing alone, did not give the police probable cause to arrest the defendants. Probable cause requires something more than "mere suspicion." *Brinegar v. United States*, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949). Officers have probable cause to make a warrantless arrest only if the facts and circumstances within their knowledge and of which they have reasonably trustworthy information are " 'sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed," and that the persons to be arrested committed it. *Draper v. United States*, 358 U.S. 307, 313, 79 S.Ct. 329, 333, 3 L.Ed.2d 327 (1959) (quoting *Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925); *United States v. Raborn*, 872 F.2d 589, 593 (5th Cir.1989)). While this standard certainly does not require proof beyond a reasonable

doubt, it does require at least a "substantial probability" of criminal activity. *Raborn*, 872 F.2d at 593.

■ In this case, the facts within the knowledge of the officers would at most cause them to believe that the defendants were operating some type of chemical laboratory and producing some sort of chemical smell; it would not cause them to believe that the defendants were producing illegal drugs in that laboratory. The Fifth Circuit addressed a similar situation in *United States v. Gordon*, 580 F.2d 827, 832 (5th Cir.1978), *cert. denied*, 439 U.S. 1051, 99 S.Ct. 731, 58 L.Ed.2d 711 (1978), and *cert. denied*, 439 U.S. 1079, 99 S.Ct. 860, 59 L.Ed.2d 49 (1979). In *Gordon*, agents learned that the defendants had purchased a substantial amount of chemicals which were not in themselves unlawful. In considering whether there was probable cause to issue a search warrant, the court observed:

> [A] bright line cannot always be drawn between "mere suspicion" and probable cause. The distinction is more difficult when the suspect is in possession of materials which, in and of themselves, are not unlawful but which can be used for the accomplishment of an unlawful purpose. The impartial magistrate, however is not required to focus with tunnel vision solely on possession, but obviously may consider all relevant surrounding facts and circumstances such as *the means by which a controlled substance may be manufactured and conduct reasonably indicating an intent to engage in unlawful activity*

*Gordon*, 580 F.2d at 832 (emphasis added). This passage indicates that where the conduct of the defendants has an overtly innocent explanation, the government must be able to point to some conduct indicating a criminal intent.

Thus, in cases in which the Fifth Circuit has upheld searches or arrests based, in part, on the defendants' possession of chemicals, there invariably were facts in the record which made criminal use of

---

**10.** Judicial notice is taken that August 26, 1991, was a Monday.

those chemicals appear likely. *Raborn*, 872 F.2d at 591 (confidential informant stated that defendants were planning to manufacture illegal drugs and agent detected odor of acid commonly used in the manufacture of amphetamines); *United States v. Hare*, 772 F.2d 139, 142 (5th Cir. 1985) (defendant simultaneously purchased laboratory equipment, large quantities of chemicals, and large quantities of ice, all of which were commonly used in the manufacture of amphetamines); *Gordon*, 580 F.2d at 832–33 (defendants purchased chemicals which were essential ingredients in the manufacture of methaqualone, gave inconsistent explanations regarding what they intended to use the chemicals for, referred to the chemicals as "drugs," and transported chemicals and lab equipment using evasive driving techniques); *United States v. Martin*, 509 F.2d 1211 (9th Cir.) (defendants purchased chemicals and agents smelled odor of chemicals that could be used to manufacture methamphetamine, defendants engaged in evasive driving techniques indicating they feared being followed, defendants told seller of chemicals that they were purchasing them for a company, but then drove away from the company toward their house; and defendants stood outside their house and looked around as though they were fearful of being watched), *cert. denied*, 421 U.S. 967, 95 S.Ct. 1958, 44 L.Ed.2d 455 (1975).

In this case, by contrast, the officers were aware of no facts which indicated that the defendants were likely engaged in illegal activity. The government introduced no evidence indicating that the boiling flasks or the PVC pipe were commonly used in the production of illegal drugs. *Compare Hare*, 772 F.2d at 142 (defendant purchased lab equipment commonly used in production of amphetamines). There was no evidence that the chemical smell reported by the informant was associated with chemicals that are used to manufacture illegal drugs. *Compare Raborn*, 872 F.2d at 591 (agent detected odor of acid commonly used in production of amphetamines). There was also no evidence that the defendants engaged in suspicious behavior, such as driving evasively or looking

around, which indicated that they were conscious of guilt and fearful of being caught. *Compare Gordon*, 580 F.2d at 833 (evasive driving); *Martin*, 509 F.2d at 1214 (defendants looking around indicated "fear of being watched and a consciousness of wrongdoing").

This case may be analogized to *Sibron v. New York*, 392 U.S. 40, 62–63, 88 S.Ct. 1889, 1902–03, 20 L.Ed.2d 917 (1968), in which a police officer had observed the defendant talking to known narcotics dealers. The Court held that these observations did not give the officer probable cause to arrest the defendant, because the officer could not hear the conversation, and, for all he knew, the defendant could have been talking about the World Series. 392 U.S. at 62, 88 S.Ct. at 1902. Similarly, in this case, all that the police had observed was that the defendants were using or producing some sort of chemicals. These observations would no more give the police probable cause to believe that the defendants were producing illegal drugs, than would a defendant's conversations with known addicts cause the police to believe that the defendant was discussing narcotics. The government has not met its burden of proving that there was probable cause to arrest the defendants.

### D. Good Faith Exception

 The good faith exception to the exclusionary rule does not apply to the situation presented here. In *United States v. Williams*, 622 F.2d 830, 840 (5th Cir. 1980) (en banc), *cert. denied*, 449 U.S. 1127, 101 S.Ct. 946, 67 L.Ed.2d 114 (1981), the court held that "evidence is not to be suppressed under the exclusionary rule where it is discovered by officers in the course of actions that are taken in good faith and in the reasonable, although mistaken, belief that they were authorized." The good faith exception "is not devised for the unlawful conduct of all officers who mean well." *United States v. Whaley*, 781 F.2d 417 (5th Cir.1986). Rather, the good faith belief must also be objectively reasonable. *Whaley*, 781 F.2d at 421; *Williams*, 622 F.2d at 844. The good faith exception ap-

plies to warrantless arrests. *United States v. De Leon–Reyna,* 930 F.2d 396, 400 (5th Cir.1991).

Up to the present, the exception has been primarily applied to situations in which the police interpret or rely on an external source of authority, such as a warrant or a statute, which later turns out to be invalid or not to authorize the action taken. *E.g. Williams,* 622 F.2d at 844 (reasonable belief that statute authorized arrests by Drug Enforcement Agents); *United States v. Mahoney,* 712 F.2d 956 (5th Cir.1983) (reliance on arrest warrant), *cert. denied,* 468 U.S. 1220, 104 S.Ct. 3590, 82 L.Ed.2d 887 (1984). *See also De Leon–Reyna,* 930 F.2d at 402 (King, Circuit Judge, concurring in the judgment). In addition, the exception has been applied where the police reasonably rely on erroneous information that, had it been true, would have justified the action taken. *Illinois v. Rodriguez,* 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990) (consensual search valid where officers reasonably believed that occupants of apartment had common control over premises, and therefore had authority to consent to a search of the apartment); *De Leon–Reyna,* 930 F.2d 396 (*Terry* stop valid where officer reasonably relied on report from dispatcher indicating that license plate on vehicle was stolen). However, the exception has not been applied to circumstances, such as this one, where the police mistakenly believe that the facts that they have observed constitute probable cause, when they do not in actuality.

Even if the good faith exception could apply to such a situation, however, it cannot be applied here, because the arrest was neither objectively reasonable nor made in good faith. Agent Black testified that he believed that there was probable cause to arrest the defendants. With all due respect to Agent Black, however, such a belief, if sincerely held, was not reasonable. The police clearly lacked a probable cause to arrest the defendants. As previously discussed, the officers were aware of no facts, even from confidential informants, that linked either the defendants or the Mallory property to any illegal activity. Under these circumstances, it is found that

a reasonable officer would not have thought that there was probable cause.

In addition, the evidence to the effect that the officers believed in good faith that there was probable cause to make the arrest is insufficient. *See Scott v. United States,* 436 U.S. 128, 136, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168 (1978). It appears, instead, that the arrest was purposefully delayed until the defendants left the property, in order that the government could seize additional evidence from the van. Agent Black testified he felt he had probable cause to arrest the defendants as early as 2:00 a.m on the morning of August 27th, 1991; and the affidavit reflects that the officers observed all items of information that they included therein by 1:40 a.m. Yet, the officers did not actually arrest the defendants until they departed the scene at 4:15 a.m., over two hours after Agent Black felt that he had probable cause. On cross-examination, defense counsel sought to establish that Agent Black delayed the arrest so that the officers could do a protective search of the van for weapons, and possibly uncover additional evidence. Agent Black denied this conduct, but his explanation for the delay is unconvincing. Agent Black stated that he was waiting for back-up units, but it seems unlikely that this could take over two hours; and, in any event, several vehicles were already in position at the time of the arrest. Accordingly, it is found that the officers did not believe in good faith that there was probable cause to arrest the defendants.

### E. Can the Halting of the Van Be Upheld as a *Terry* Stop?

██ As previously stated, the arrest of the defendants was illegal, because it was not supported by probable cause. The government argues, however, that the stop of the van and the temporary detention of the defendant, even if not supported by probable cause, may be upheld as a *Terry* stop, if there was reasonable suspicion, based on articulable facts, that the defendants were involved in criminal activity. It has already been found that the police conduct in this case was an arrest, not a *Terry*

stop. The stop of the van was therefore part of an illegal arrest.

Two Circuits have held that where an arrest is not supported by probable cause, it cannot be upheld on the ground that it would have been permissible had it been a *Terry* stop. *United States v. Prieto–Villa*, 910 F.2d 601, 605 (9th Cir.1990); *United States v. Ceballos*, 654 F.2d 177, 181 (2d Cir.1981); *United States v. Ramos–Zaragosa*, 516 F.2d 141, 144 (9th Cir.1975); *United States v. Strickler*, 490 F.2d 378, 381 (9th Cir.1974). While the Fifth Circuit has not addressed this precise issue, the above rule is sound. As the Supreme Court has consistently reiterated, the purpose of the exclusionary rule is to deter the police from effecting constitutional violations. *E.g. United States v. Leon*, 468 U.S. 897, 906, 104 S.Ct. 3405, 3411, 82 L.Ed.2d 677 (1984). Unquestionably, the officers violated the constitutional rights of the defendants when they arrested them without probable cause. The fact that the police might have stopped the van by means of a *Terry* stop, and that this lesser intrusion might not have violated the constitutional rights of the defendants, does not alter the fact that the intrusive means that the officers actually employed were unconstitutional. To uphold the stop of the van on the ground that it might have been accomplished in a constitutional manner would sanction, and therefore fail to deter, acts similar to the constitutional violation which actually did occur. Whether the facts would have justified a *Terry* stop of the van will not be considered.

## IV. *The Search of the Van*

After handcuffing the defendants, the officers then opened the side doors and the back door of the van, and looked inside the van. A rifle was in the van, placed slightly behind and in between the front seats. Other items in the van were covered by two or three blankets. Shortly after the officers opened the van, they threw aside the

11. As previously discussed, the stop of the van was illegal because it was part and parcel of the illegal arrest of the defendants.

12. *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) did not address this issue,

blankets, revealing several chemical containers, and a stainless steel hydrogenator. The chemical containers included a fifty-five gallon stainless steel drum and a forty gallon stainless steel drum. Because the officers who stopped the van did not testify, it is not clear why they looked inside the van. However, Agent Black hypothesized that the officers would have looked inside the van to make sure that there were no other persons inside the van.

### A. Standing

When the van was stopped, defendant McQuagge was driving and defendant McCurdy was passenger. Defendant McQuagge testified that the van was registered in his name and in the name of his wife. As both the driver and the registered owner of the van, defendant McQuagge has standing to contest the validity of the search. *United States v. Kye Soo Lee*, 898 F.2d 1034, 1037 (5th Cir.1990). Although he was only a passenger, defendant McCurdy has standing to challenge the stop of the van,[11] and to seek to suppress any evidence that was seized as the fruit of that stop.[12] *United States v. Erwin*, 875 F.2d 268, 269 n. 2 (10th Cir.1989); *United States v. Portwood*, 857 F.2d 1221, 1222 (8th Cir.1988); *United States v. Williams*, 589 F.2d 210, 214 (5th Cir.1979), *modified*, 617 F.2d 1063 (5th Cir.1980); La Fave, § 11.3(3) at 324–25.

### B. Suppression as the Fruit of an Illegal Arrest

The items seized as a result of the initial search of the van must be suppressed as the fruit of an illegal arrest. Evidence that is obtained as a result of an illegal arrest or search must be excluded, unless the evidence was obtained from an independent source or "the connection between the lawless conduct of the police and the discovery of the challenge evidence has become so attenuated as to dissipate the

because in *Rakas* the defendant did not challenge the stop of the car. 439 U.S. at 150–51, 99 S.Ct. at 434 (Powell, J., concurring).

taint.'" *Wong Sun v. United States,* 371 U.S. 471, 487, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963) (quoting *Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307 (1939)). In particular, the exclusionary rule demands the suppression of evidence that is obtained as a direct result of an unlawful search or arrest. *Wong Sun,* 371 U.S. at 485, 83 S.Ct. at 416. In this case, the search of the van was a direct result of the illegal arrest of the defendants. When an arrest is illegal, items seized during a protective search of the surrounding area must be suppressed. *See* La Fave, *supra,* § 11.4(d) at 408.

#### C. Suppression on Alternative Grounds

Alternatively, even if the police had executed a valid *Terry* stop, the subsequent search of the van would still be illegal, as it cannot be justified as a protective search for either weapons or dangerous persons.[13] In *Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), the Court held that the police may make a protective search of the passenger compartment of a car for weapons, if the police reasonably believe, based on specific and articulable facts, that the suspect is dangerous and that the suspect may gain immediate control of weapons. While the Court did not elaborate as to what facts would justify a reasonable belief that a suspect was dangerous, such facts have been held to include: the visible presence of a weapon in the car, *Long,* 463 U.S. at 1050, 103 S.Ct. at 3481; attempts to outrun police cars, *United States v. Garcia,* 909 F.2d 389, 390–91 (9th Cir.1990); reports that the occupant of the car was armed or discovery of a weapon on the defendant's person, *United States v. Maestas,* 941 F.2d 273, 176–78 (5th Cir.1991); *Glenna,* 878 F.2d at 972; *United States v. Lego,* 855 F.2d 542, 545 (8th Cir.1988); *United States v. Moore,* 786 F.2d 1308, 1316 (5th Cir. 1986); or furtive movements indicating that the defendant was reaching for a weapon. *United States v. Williams,* 822 F.2d 1174, 1179–80 (D.C.Cir.1987); *United States v. Nash,* 876 F.2d 1359, 1361 (7th Cir.1989).

In this case, there is no evidence in the record which indicates that the law enforcement officers who made the arrest reasonably believed the defendants were dangerous when they were stopped.[14] Agent Black testified, as previously related, that when the van was stopped, he had no reason to believe that defendants had weapons, and, because the arresting officers did not testify, there was no testimony indicating the officers suspected that the defendants had weapons. A *Terry* search of a car for weapons requires, at minimum, actual suspicion that weapons are present. *United States v. Lott,* 870 F.2d 778, 784 (1st Cir.1989) ("an officer cannot have a reasonable suspicion that a person is armed and dangerous when he in fact has no such suspicion"). *See also Long,* 463 U.S. at 1049, 1051, 1052 n. 16, 103 S.Ct. at 3482 n. 16 (stating that the police officer must have reasonable suspicion). Furthermore, the testimony indicates that the defendants fully cooperated with the arresting officers, and did not attempt to flee. Because the search of the van was accomplished without a warrant, the burden is on the government to establish that the search is justified. *De La Fuente,* 548 F.2d at 533. In this case, the government has failed to meet its burden of establishing that the officers either had, or could have had, a reasonable belief that the defendants were armed and dangerous.

The suggestion of the Eighth Circuit, in *United States v. Chaidez,* 906 F.2d 377,

---

**13.** Obviously, if this were the only ground for suppressing the search of the van, McCurdy, as a mere passenger in the van, would have no standing to object to the search, or to seek to suppress any fruits of that search. *Rakas,* 439 U.S. at 148, 99 S.Ct. at 433; *United States v. Martinez,* 808 F.2d 1050, 1056 (5th Cir.1987).

**14.** The defendants did have a rifle, but there was no evidence indicating that the officers saw it before they entered the van to make the protective search. Defendant McQuagge testified that the gun was behind the seats, and between the seats. There was no conflicting testimony from anyone who was present when the protective search was made. Therefore, it is found that the rifle would not have been visible to the police before they entered the van to make the protective search.

384 (8th Cir.1990), that the search of a vehicle for weapons is permissible whenever the officers have reasonable suspicion that the defendants are involved in manufacturing or distributing illegal drugs is rejected.[15] Apparently, the rationale of the decision in *Chaidez* is that because drug traffickers often carry weapons, it is always reasonable to believe that a suspected drug dealer is armed and dangerous. Such an argument, however, is inconsistent with Supreme Court precedent, which requires a particularized belief, based on the facts of each case.

The Court underscored this point in *Maryland v. Buie*, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990), when it held that a police officer who makes a home arrest may make a protective search of that house for third persons, if the officer reasonably believes, based on articulable facts, that the house harbors an individual posing a danger to those on the arrest scene. The defendant in *Buie* was arrested in his home for an armed robbery. The state argued that because the police had probable cause to arrest the defendant for a dangerous felony, it was necessarily reasonable for the officer to believe that arresting the defendant at home would be a dangerous situation requiring a protective search of the house. 110 S.Ct. at 1098 n. 2. The Court rejected the state's argument, and held that the police officer must have a particularized belief that there are persons on the premises who are a threat to the officers, in order to conduct a protective search. *Id.* Similarly, in situations that the Court has frankly recognized are most likely to be dangerous, such as roadside encounters and on-the street confrontations, the Court has required the police to have a reasonable suspicion that the individual is dangerous in order to conduct a protective search for weapons. *Long*, 463 U.S. 1032, 103 S.Ct. 3469; *Brown v. Texas*, 443 U.S. 47, 49, 99 S.Ct. 2637, 2639, 61 L.Ed.2d 357 (1979); *Terry*, 392 U.S. 1, 88

S.Ct. 1868. Indeed, "[e]ven in high crime areas, where the possibility that any given individual is armed is significant, *Terry* requires reasonable, *individualized* suspicion before a frisk for weapons can be conducted". *Buie*, 110 S.Ct. at 1093 n. 2 (emphasis added); *United States v. Rideau*, 949 F.2d 718, 721 (5th Cir.1991).

■ The Court has, therefore, repeatedly repudiated the notion that peace officers can assume danger merely from the nature of a crime, the area in which the confrontation occurred, or the likelihood of danger in a situation. These pronouncements similarly mandate that this court reject the idea that the peace officers can assume danger merely because many, or even most drug dealers are armed and dangerous. *Long* requires an individualized belief that an individual is dangerous before peace officers can search a car for weapons. This rule recognizes that because the intrusion of a protective search is substantial, some specific showing of its need is required. In addition, the requirement of a particularized belief acknowledges that trained peace officers are fully capable of making accurate judgments about the danger of an individual based on the particular circumstances of each situation. Consequently it is concluded that reasonable suspicion that a defendant is involved in illegal drugs cannot, standing alone,[16] justify a protective search of an auto. It is accordingly unnecessary to consider whether the peace officers had reasonable suspicion that the defendants were involved in manufacturing or dealing illegal drugs.

The search of the van can also not be justified as a protective search for third persons. The record is devoid of any facts sufficient to form a reasonable belief that there were other individuals in the van. Hence, it is found that the officers had no reasonable belief that there were dangerous individuals in the van. In addition, the

---

**15.** *Chaidez* is distinguishable from this case, because in *Chaidez* the search was also supported by consent. 906 F.2d at 381–82.

**16.** Such information may, when combined with other facts, provide the foundation for a reason-

able belief that the defendant is dangerous. *E.g. United States v. Trullo*, 809 F.2d 108, 113 (1st Cir.1987) (suspicion of drug activity coupled with bulge in pocket).

affidavits and testimony indicated that three DEA agents watched the defendants on the Mallory property from 9:00 p.m. until 4:00 a.m. During this time, the agents observed no one but McQuagge and McCurdy, and they watched the defendants load equipment into the back of the van. The record therefore strongly indicates that at the time that the peace officers stopped the van, they knew that McQuagge and McCurdy were alone, and that there was nothing in the back but equipment.

 In *Buie*, the court noted, in *dicta*, that as an incident to an arrest, officers can "as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces from which an attack could be immediately launched." *Buie*, 110 S.Ct. at 1098. This statement has no application to a *Terry* search of a van for individuals. First, *Buie* only authorizes a protective sweep "in conjunction with an in-home arrest." *Buie*, 110 S.Ct. at 1099. Because the police officer has an arrest warrant, they are entitled to search anywhere in the house where the defendant may be, and they have a right to be in the room where the defendant is finally apprehended. The *Buie* dicta thus applies only in the unique circumstance where the police have legitimately invaded the sanctity of the home, and have a right to be in the very room where the arrest occurs. Once this intrusion has occurred, the additional intrusion of looking in closets and adjoining spaces in that room is justified by the potential danger to the police officers. Significantly, however, once the arrest occurs, the police no longer have a legitimate right to look in other rooms in the house, absent reasonable suspicion that these rooms harbor dangerous third persons. A *Terry* stop of a van is fundamentally different from the *Buie* situation, because the peace officers have no right to enter the van absent reasonable suspicion of danger. To permit the peace officers to invade a defendant's reasonable expectation of privacy in his vehicle without reasonable suspicion, would venture far beyond the limited intrusion authorized in *Buie*.

In addition, an arresting officer in a suspect's home is peculiarly vulnerable. "[U]nlike an encounter on the street *or along the highway*, an in-home arrest puts the officer at the disadvantage of being on his adversary's 'turf'. An ambush in a confined setting of unknown configuration is more to be feared that it is in open, more familiar surroundings." *Buie*, 110 S.Ct. at 1098 (emphasis added). By contrast, officers who stop a van control the time and place of the stop, are on the open road, and can position themselves so as to protect against the unexpected.

Even if some extraordinary circumstances might permit a protective sweep of a van without reasonable suspicion, they are not present here. The officers took the defendants by surprise, and forced them off the road at a time and place of the officers' own choosing. The van was blocked by several sheriff's department and DEA cars, and surrounded by at least eight to ten officers with their guns drawn. The officers were not vulnerable to the immediate and unexpected attack envisioned in *Buie*.

## V. *The Search of McQuagge's Person*

 Following the arrest, the police searched defendant McQuagge's person "for weapons and or contraband" and discovered "a small amount of what appeared to be amphetamine" in McQuagge's front shirt pocket. Because the arrest was illegal, any evidence found in a search made incident to that arrest must also be suppressed. *See* 4 La Fave, *supra*, § 11.4(d) at 408. Defendant McCurdy has standing to challenge the search of McQuagge's person as the fruit of the illegal stop of the van. *Williams*, 589 F.2d at 214; *See* La Fave, *supra*, § 11.3(e) at 325, 327. The arrest of McQuagge and the subsequent search incident thereto immediately followed the stop of the van; there was neither a significant intervening length of time, nor an intervening act to diminish the taint of the illegal stop. Therefore the tablet seized from McQuagge's person is

inadmissible against defendant McCurdy, as well as McQuagge.

■ Even if the stop of the van had been a lawful *Terry* stop, the seizure of the amphetamine tablet would have exceeded the scope of a permissible frisk for weapons. Such a frisk must be "confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." *Terry,* 392 U.S. at 29, 88 S.Ct. at 1884. If during a lawful pat-down an officer feels an object which obviously not a weapon—such as an amphetamine tablet—seizure of it is not permissible. *United States v. Thompson,* 597 F.2d 187, 191 (9th Cir.1979); La Fave, § 9.4(b) at 520.

### VI. *The Search Warrants*

■ The next issue to be adjudged is whether the evidence seized pursuant to the search warrants issued by Magistrate–Judge Guthrie must be suppressed. When the officers obtained search warrants for the Mallory property and the two vans, they submitted an affidavit which contained the following information: the informant's tip that there was a strong chemical smell on the property; the observations made during the surveillance of the property; the presence of a hydrogenator and several chemical containers in the back of the blue ford van; the tablet that appeared to be amphetamine in McQuagge's pocket; and the fact that a DEA NADDIS check turned up Defendant McQuagge's name as a documented amphetamine supplier in the Canton, Texas area.

As previously discussed, information regarding the hydrogenator, the chemical container, and the amphetamine tablet was illegally obtained incident to the unlawful arrest of the defendants. The information regarding the DEA NADDIS check is also a fruit of the illegal arrest, because the peace officers were unaware that defen-

dant McQuagge was on the Mallory property until after the arrest.[17]

■ Where information in an affidavit is illegally obtained, the search made in accordance with that warrant will be upheld only if the untainted information in the affidavit is sufficient to establish probable cause. *United States v. Williams,* 594 F.2d 86, 95 n. 17 (5th Cir.1979), *aff'd,* 622 F.2d 830 (5th Cir.1980) (en banc) *cert. denied,* 449 U.S. 1127, 101 S.Ct. 946, 67 L.Ed.2d 114 (1981); *United States v. Tarrant,* 460 F.2d 701, 703–04 (5th Cir.1972); *James v. United States,* 418 F.2d 1150, 1152 (D.C.Cir.1969). As previously discussed, the information gathered from the informant and the surveillance would not give the officers probable cause to believe that the defendants were engaged in illegal activity. By reason thereof, the searches made pursuant to the warrant are therefore invalid, because they lacked probable cause.

■ The defendants are entitled to seek to suppress the evidence uncovered in the searches authorized by the warrant, for the reason that the searches were the fruit of the illegal arrest. Agent Black testified that he felt he had probable cause to search the property and arrest the defendants as early as 2:00 a.m. Yet Agent Black did not begin preparing the affidavit until after the arrest of the defendants. It can be inferred that the officers might not have sought the warrant without the arrest. More importantly, because the affidavit clearly would have lacked probable cause without the information gained from the arrest, it is found that the warrants would not have issued but for the arrest. Moreover, only seven hours elapsed between the arrest at 4:00 a.m. and the issuance of the search warrant at 11:00 a.m. During this time, the officers put together an affidavit, obtained a warrant, secured the vehicles and property to be searched,

---

**17.** The government failed to produce any evidence indicating when the DEA NADDIS check was done, or when the officers first learned that McQuagge was on the Mallory property. Defendant McCurdy, however, testified that Agent Black acted surprised that McQuagge was present. In addition, the affidavit states that the DEA agents observed a "heavyset white male" on the property, and does not indicate that the agents knew who this male was. It is, therefore, found that the officer first learned that McQuagge had been on the Mallory property after the arrest, and thus the DEA NADDIS check on McQuagge could not have been done until after the arrest.

and sat waiting at the Mallory property for the warrant. No significant intervening event occurred which diminished the taint of the illegal arrest. It requires no "sophisticated argument" to see that the search warrants were obtained as a direct result of the illegal arrest. *Nardone*, 308 U.S. at 341, 60 S.Ct. at 268. Hence, the evidence seized in accordance with the warrants is the fruit of an illegal arrest.[18]

■ As a final matter, it must be resolved whether the good faith exception to the exclusionary rule for reasonable reliance on a search warrant applies. In *Leon*, 468 U.S. 897, 104 S.Ct. 3405, the Court held that the exclusionary rule does not bar evidence seized in good faith reliance on a warrant issued by a neutral and detached magistrate but later found to lack probable cause. This exception, however, does not apply when, as in this case, the evidence necessary to support the magistrate's finding of probable cause is illegally obtained. *United States v. Scales*, 903 F.2d 765, 767–68 (10th Cir.1990); *United States v. Vasey*, 834 F.2d 782, 789–90 (9th Cir.1987). The *Leon* exception is based on three premises. The first is that the illegally seized evidence was obtained pursuant to a warrant. *Leon*, 468 U.S. at 913–14, 104 S.Ct. at 3415–16. The second is that it is the magistrate, not the peace officers, who has violated the defendant's constitutional rights by issuing the warrant. *Leon*, 468 U.S. at 916, 104 S.Ct. at 3417. Because the magistrate "[has] no stake in the outcome of criminal prosecution[s]," excluding evidence will not significantly deter future violations by a magistrate. As a result, it makes no sense to punish a police officer for the error of a magistrate. *Leon*, 468 U.S. at 916, 917, 919, 104 S.Ct. at 3417, 3418. Third, the magistrate's determination of probable cause is entitled to great deference by a reviewing court. *Leon*, 468 U.S. at 914, 104 S.Ct. at 3416; *Spinelli v. United States*, 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637 (1969). For this reason, it is consistent with this deference to uphold a search executed in accordance with a warrant, as long as there is a "substantial basis" for believing that the warrant is supported by probable cause. *Leon*, 468 U.S. at 915, 104 S.Ct. at 3416; *Gates*, 462 U.S. at 239, 103 S.Ct. at 2332.

None of these assumptions is applicable in this case. In this case, for example, the officers did not rely on a warrant when they arrested the defendants and searched the van. Furthermore, the officers themselves perpetrated the constitutional violation by arresting the defendants illegally. Finally, the magistrate-judge did not make any determination that the evidence contained in the affidavit was legally seized, nor could she reasonably be expected to have done so. *Vasey*, 834 F.2d at 789–90 (magistrate is not expected to inquire in to whether evidence submitted into an affidavit is legally seized). Even if the magistrate-judge had made such a determination, it would be a legal ruling subject to *de novo* review, not the deference accorded a finding of probable cause.

■ Even if the good faith exception to a situation could be applied where the affidavit contains illegally seized evidence,[19] it could not be done here. The good faith exception assumes that the magistrate-judge has the facts necessary to her determination at her disposal, and that the affidavit contains no knowing or intentional misrepresentations. *Leon*, 468 U.S. at 923, 104 S.Ct. at 3421. In this case, the magistrate-judge was not presented with the information that would have suggested that the evidence was illegally seized. She was told that the van was stopped; she was not told that the defendants were handcuffed, ordered to lie prone, and had guns pointed at them, facts indicating that the defendants were placed under arrest. She was likewise told that the evidence seized was

---

18. Because both defendants have standing to suppress evidence seized pursuant to the search warrants as the fruit of their illegal arrest, it is unnecessary to consider whether the defendants would have also have standing to contest the search of the silos and of the GMC van directly.

19. *See United States v. Carmona*, 858 F.2d 66, 68 (2nd Cir.1988); *United States v. Thornton*, 746 F.2d 39, 49 (D.C.Cir.1984).

"in plain view," not that the items were covered by blankets. Plainly, the affidavit failed to mention precisely that information that suggested that the evidence was illegally seized evidence. In light of the critical importance of these omissions and the government's failure to explain why these inaccuracies were included, it is found that these omissions were intentional. It follows that, because the magistrate-judge lacked the information necessary to decide whether the evidence was seized illegally, the good faith exception does not apply. *Vasey*, 834 F.2d at 790 n. 4; *Solomon*, 728 F.Supp. at 1549–50.

## VII. *The Statements Made by Defendant McCurdy*

### A. Factual Background

Shortly after his arrest, at about 4:30 a.m. on the morning of August 27, 1991, defendant McCurdy was given *Miranda* warnings. McCurdy testified that, on several occasions after his arrest, he was interrogated about his activities on the Mallory property. On each occasion, McCurdy told the officers that if they had any questions, they would have to talk to his lawyer. McCurdy testified that he understood that he had requested counsel, and that he could tell that the officers understood what he meant.

At approximately 10:30 a.m., on the morning of August 27, 1991, Deputy Sheriff Corbett Goth transported defendant McCurdy to the Van Zandt County jail. During the twenty minute ride, defendant McCurdy was seated in the passenger compartment, next to Deputy Goth, and the two were talking. When the conversation came to a lull, McCurdy turned to Goth and the following conversation ensued:

McCurdy: "Well, I guess I can report a crime to you now."

Goth: "What happened?"

McCurdy: "Well, our building was burglarized."

Goth: "Well, what did they get?"

McCurdy: "One Hundred and ten pounds of phenylacetic acid."

Deputy Goth, then asked how to spell the name of the acid, and McCurdy told him. Deputy Goth then inquired whether McCurdy had said 100 pounds were stolen, and McCurdy repeated that 110 pounds were stolen.

At this point, Goth asked McCurdy, "more out of curiosity than anything else," how much money could be made out of the acid. McCurdy replied that he used anywhere between thirty three and forty pounds at a time, at between twelve and twenty thousand dollars a pound. Goth then asked how many times McCurdy had done that. McCurdy cut off questioning at this point, saying, "I don't think I better tell you."

Deputy Goth testified that he did not report the theft. However, he did make a report for Agent Black of the conversation.

### B. Are the Statements Admissible Under the Fifth Amendment?

▮▮▮▮ Under the rule of *Miranda v. Arizona*, 384 U.S. 436, 474, 86 S.Ct. 1602, 1627, 16 L.Ed.2d 694 and *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981), if a defendant "express[es] his desire to deal with the police only through counsel," the interrogation must cease until an attorney is provided. *Edwards*, 451 U.S. at 485, 101 S.Ct. at 1885. If the police resume interrogation, then any statements obtained are inadmissible, even if the accused knowingly, voluntarily, and intelligently waives his fifth amendment rights. *Minnick v. Mississippi*, —— U.S. ——, 111 S.Ct. 486, 492, 112 L.Ed.2d 489 (1990); *Cervi v. Kemp*, 855 F.2d 702, 706 (11th Cir.1988). However, if the defendant "initiates further communication, exchanges or conversations with the police," *Edwards*, 451 U.S. at 485, 101 S.Ct. at 1885, further interrogation is permissible; if the government proves that the defendant knowingly, voluntarily, and intelligently waived his fifth amendment right to counsel. *Smith v. Illinois*, 469 U.S. 91, 95, 105 S.Ct. 490, 492, 83 L.Ed.2d 488 (1984); *Oregon v. Bradshaw*, 462 U.S. 1039, 1044, 103 S.Ct. 2830, 2834, 77 L.Ed.2d 405 (1983). The *Edwards* framework prohibits interro-

gation not only about the crime for which the defendant was charged, but about unrelated crimes as well. *Arizona v. Roberson,* 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988).

McCurdy's statements are protected by the *Edwards* framework, only if he "clearly asserted his right to counsel" and if they were made in response to interrogation. *Edwards,* 451 U.S. at 485, 101 S.Ct. at 1885; *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). It is found that McCurdy clearly asserted his right to counsel, and that this request was unequivocal. *See Smith,* 469 U.S. 91, 105 S.Ct. 490; *Edwards,* 451 U.S. at 485, 101 S.Ct. at 1885; *Nash v. Estelle,* 597 F.2d 513 (5th Cir.), *cert. denied,* 444 U.S. 981, 100 S.Ct. 485, 62 L.Ed.2d 409 (1979).

█ Not all of McCurdy's statements were made in response to interrogation however. McCurdy's first statement, indicating that he wanted to report a crime, was a spontaneous declaration not prompted by any interrogation. *Innis,* 446 U.S. 291, 100 S.Ct. 1682; *Plazinich v. Lynaugh,* 843 F.2d 836 (5th Cir.1988).

█ Deputy Goth's first few questions, up to and including the question about how much of the acid was stolen, were not interrogation for *Miranda* purposes. Interrogation occurs "whenever a person in custody is subjected to express questioning" or to "any words or actions on the arrest on the part of the police ... that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis,* 446 U.S. at 301, 100 S.Ct. at 1690. Not every express question is interrogation, however. Routine inquiries incident to the custodial relationship, such as asking the defendant if he wants to use the restroom or wants food or water, are not interrogation. *Oregon v. Bradshaw,* 462 U.S. 1039, 1045, 103 S.Ct. 2830, 2834, 77 L.Ed.2d 405 (1983). Neither are routine biographical questions, such as inquiries about a defendant's social security number, address, date of birth, etc. *United States v. Dougall,* 919 F.2d 932 (5th Cir.1990), *cert. denied,* — U.S. ——, 111 S.Ct. 2860, 115 L.Ed.2d 1027 (1991); *United States v.*

*Menichino,* 497 F.2d 935, 941 (5th Cir. 1974). Furthermore, police statements that are part of a spontaneous colloquy initiated by the defendant and that are immediately prompted by a statement of the defendant are not interrogation. *Andersen v. Thieret,* 903 F.2d 526, 532 (7th Cir.1990) (defendant says "I slapped her"; police officer replies "who?"); *Turner v. Sullivan,* 661 F.Supp. 535 (E.D.N.Y.1987) (defendant said "my leg is hurt"; police officer responded "what happened to you?"), *aff'd,* 842 F.2d 1288 (2d Cir.1988); *United States v. Rhodes,* 779 F.2d 1019, 1032 (4th Cir.1985) (defendant, after seeing police officer seize notebook, says, "You can't take that"; officer says, "Why?").

Deputy Goth's initial statements fell into this spontaneous colloquy category. Each question responded to a statement just made by McCurdy. Deputy Goth's questions were merely intermittent remarks in a conversation that McCurdy initiated and controlled.

█ The fact that a defendant initiates a conversation, however, does not necessarily mean that the police officer's questions are not interrogation. "If ... the conversation is not wholly one-sided, it is likely that the officers will say or do something that clearly would be 'interrogation.'" *Edwards,* 451 U.S. at 486 n. 9, 101 S.Ct. at 1885 n. 9. In this case, Deputy Goth interrogated McCurdy, when he asked him how much money he could make out of the acid. This question was not prompted by and did not logically follow from defendant McCurdy's previous statement. Moreover, the question was framed so as to elicit a potentially incriminating statement indicating the high value that the chemical would generate.

In a custodial setting, the defendant is under an inherent pressure to answer the questions put to him. *Miranda,* 384 U.S. at 445–58, 86 S.Ct. at 1612–19. Therefore, any exceptions to the general rule that express questions are interrogation must be narrowly confined to the underlying purpose of the applicable exception. *E.g. United States v. Webb,* 755 F.2d 382, 389 (5th Cir.1985) (question, "What kind of shit

did you get yourself into?", posed by jail administrator to defendant for the purpose of determining where to place him, was interrogation and did not fall under exception for questions made incident to custody), *cert. denied,* 479 U.S. 1038, 107 S.Ct. 894, 93 L.Ed.2d 846 (1987). Deputy Goth's question was not a routine question asked pursuant to custody. There was no testimony, for example, indicating that Deputy Goth's inquiry was made in accordance with the Sheriff's Department procedures. *See Webb,* 755 F.2d at 389 (fact that administrator's question was not part of standard jail procedure indicated that question was not routine administrative inquiry). In fact, Deputy Goth stated that he asked the question "out of curiosity." *Miranda's* definition of custodial interrogation has no general exception for the curiosity of a law enforcement officer, particularly where the "curiosity" is calculated to trigger an incriminating response.

 It is found that Deputy Goth's interrogation took place in the conversation that McCurdy initiated. It must therefore be determined "whether a valid waiver of the right to counsel and the right to silence [has] occurred, that is, whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances, including the necessary fact that the accused, not the law enforcement officer, reopened the dialogue with the police." *Edwards,* 451 U.S. at 486 n. 9, 101 S.Ct. at 1885 n. 9.

Whether a waiver occurred depends upon "the particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused." *Oregon v. Bradshaw,* 462 U.S. 1039, 1046, 103 S.Ct. 2830, 2835, 77 L.Ed.2d 405 (1983) (quoting *North Carolina v. Butler,* 441 U.S. 369, 374–375, 99 S.Ct. 1755, 1758, 60 L.Ed.2d 286 (1979); *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)). Significantly, McCurdy was not readvised of his rights nor did he explicitly waive them prior to Goth's interrogation. Because "additional safeguards are necessary when the accused asks for counsel," *Edwards,* 451 U.S.

at 484, 101 S.Ct. at 1884, the government arguably bears a heavier burden of proving a subsequent waiver after the accused has invoked the right to counsel than in other *Miranda* situations. *United States v. Morrow,* 731 F.2d 233, 237 n. 10 (4th Cir.), *cert. denied,* 467 U.S. 1230, 104 S.Ct. 2689, 81 L.Ed.2d 883 (1984). Consequently, it will be a rare case where the government can establish that a waiver occurred after the defendant has previously invoked his right to counsel, absent a showing of either an express waiver or the administration of a fresh set of warnings shortly before interrogation.

This, however, is such a case. As Justice Marshall aptly observed,

> When a suspect commences a conversation with a policeman, he has reason to expect that, as in any conversation, there will be a give-and-take extending beyond the subject matter of his original remarks. It may, therefore, be appropriate to conclude that the suspect's waiver of his Fifth Amendment rights extend to the entire conversation.

*Wyrick v. Fields,* 459 U.S. 42, 51, 103 S.Ct. 394, 398, 74 L.Ed.2d 214 (1982) (Marshall, J., dissenting). McCurdy initiated a conversation about the burglary of a large amount of phenylacetic acid. Having just been arrested on narcotics charges, McCurdy had to know that his statement would provoke the curiosity of a law enforcement officer, and that the officer would attempt to find out information about its value and its use. Defendant McCurdy had been advised of his rights just six hours earlier. McCurdy admitted on cross-examination that he had been arrested before and that he understood his rights. Furthermore, McCurdy himself cut off questioning, indicating he understood his right to do so. Conceivably, Goth's question caught McCurdy off-guard and prompted him to make a statement he did not intend to make. However, *Edwards* and *Miranda* do not prohibit all forms of "subtle coercion" in a custodial setting. *Innis,* 446 U.S. at 303, 100 S.Ct. at 1691. In the unique circumstances of this case, it is found that McCurdy knowingly, voluntarily and intelligently waived his Fifth Amend-

ment rights to counsel and silence with respect to the conversation that occurred.

### C. Must the Statements be Suppressed As Fruits of An Unlawful Arrest?

 A statement obtained through custodial interrogation after an illegal arrest must be suppressed "unless intervening events break the causal connection between the illegal arrest and the confession so that the confession is 'sufficiently an act of free will to purge the primary taint.'" *Taylor v. Alabama,* 457 U.S. 687, 690, 102 S.Ct. 2664, 2667, 73 L.Ed.2d 314 (1982) (quoting *Wong Sun v. United States,* 371 U.S. 471, 486, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963)); *Brown v. Illinois,* 422 U.S. 590, 602, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416 (1975); *United States v. Webster,* 750 F.2d 307 (5th Cir.1984), *cert. denied,* 471 U.S. 1106, 105 S.Ct. 2340, 85 L.Ed.2d 855 (1985). The factors that must be considered in considering whether a confession has been purged of the taint of the illegal arrest include "the temporal proximity of the arrest and the confession, the presence of intervening circumstances, ... and particularly, the purpose and flagrancy of the official misconduct." *Taylor,* 457 U.S. at 690, 102 S.Ct. at 2667; *Brown,* 422 U.S. at 603–04, 95 S.Ct. at 2261–62. The government bears the burden of proving that the taint of the illegal arrest is sufficiently dissipated that the statement should not be suppressed. *Taylor,* 457 U.S. at 690, 102 S.Ct. at 2667; *Brown,* 422 U.S. at 604, 95 S.Ct. at 2262.

 Statements that are fruits of an illegal arrest are excluded to serve the deterrent purposes of the Fourth Amendment. *Taylor,* 457 U.S. at 690, 102 S.Ct. at 2667; *Brown,* 422 U.S. at 601, 95 S.Ct. at 2260. Therefore, the fact that a statement is voluntary and admissible for Fifth Amendment purposes "is merely a threshold requirement for fourth amendment analysis." *Taylor,* 457 U.S. at 690, 102 S.Ct. at 2667; *Dunaway v. New York,* 442 U.S. at 217, 99 S.Ct. at 2259: *Webster,* 750 F.2d at 324. Similarly, the giving of *Miranda* warnings prior to the statement, although a relevant factor, is not sufficient alone to purge the taint of an illegal arrest.

*Brown,* 422 U.S. at 603, 95 S.Ct. at 2261; *Webster,* 750 F.2d at 324. Thus, the courts consistently suppress statements as fruits of illegal arrests, even though the statements were preceded by *Miranda* warnings.

 Applying the above factors, it is found that the statement McCurdy made in response to Deputy Goth's interrogation must be suppressed as the fruit of McCurdy's unlawful arrest. The time period between McCurdy's arrest and his statement to the Deputy Goth was just over six hours, a period of time during which he was continuously in custody. This time period has been held not to be sufficient to purge the taint of an illegal arrest. *Taylor,* 457 U.S. at 690, 102 S.Ct. at 2667 (six hours between arrest and confession); *Webster,* 750 F.2d at 324–25 (twelve hours between arrest and statement).

In addition, the misconduct by law enforcement officers here was flagrant. The officers clearly lacked probable cause to arrest the defendants. As previously discussed, the officers were aware of no facts, even from the confidential informant, that linked either the defendants or the Mallory property to any illegal activity. Under these circumstances, it is found that a reasonable law enforcement officer would not have thought that there was probable cause under these circumstances. *See Brown,* 422 U.S. at 606, 95 S.Ct. at 2263 (White, J., concurring in the judgment) (statements must be excluded as the fruit of an illegal arrest if the officers knew or should have known that the arrest was without probable cause); *Brown,* 422 U.S. at 609, 95 S.Ct. at 2264 (Powell, J., concurring in part).

It is also indicative of flagrant misconduct by law enforcement officers, if the arrest appears to have been made for investigative purposes. *Brown,* 422 U.S. at 605, 95 S.Ct. at 2262. In *Brown* and *Dunaway,* the Court determined that the arrests were made for investigative purposes, based on admissions to such a motivation by law enforcement officers. *Brown,* 422 U.S. at 605, 95 S.Ct. at 2262; *Dunaway,* 442 U.S. at 203, 218, 99 S.Ct. at 2251, 2259.

In *Taylor*, the Court inferred an investigatory purpose from the lack of probable cause. 457 U.S. at 693, 102 S.Ct. at 2668. A similar inference is amply justified here. Agent Black testified that he felt that he had probable cause to arrest the defendants as early as 2:00 a.m. on the morning of August 27th, 1991; and the affidavit reflects that the officers observed everything that they included therein by 1:40 a.m. Yet the officers did not actually arrest the defendants until they departed the scene at 4:15 a.m., over two hours after Agent Black felt that he had sufficient probable cause. On cross-examination, defense counsel sought to establish that the officers delayed the arrest so that they could do a protective search of the van for weapons, and possibly uncover additional evidence. Agent Black denied this, but, as explained in Part III D, at 651, his explanation for the delay is unconvincing. Furthermore, the manner in which the arrest was conducted was "calculated to cause surprise, fright, and confusion." *Brown*, 422 U.S. at 605, 95 S.Ct. at 2262. The defendants were then taken to the property, and held for what the agents knew would be some time until a search warrant was obtained. During this time, defendant McCurdy was questioned several times, despite his repeated refusals to talk in the absence of counsel. It is, therefore, found that the arrest was made so as to obtain evidence from the van and incriminating statements from the defendants.

Finally, there was no intervening circumstance of any significance. *Miranda* warnings were administered over six hours before the statement, and no warnings were administered immediately prior to the interrogation. The fact that McCurdy initiated the conversation with Deputy Sheriff Goth is of little significance for Fourth Amendment purposes. The initiation of a conversation merely made the interrogation permissible under *Edwards*. As previously noted, voluntariness for Fifth Amendment purposes is merely a threshold inquiry; it does not resolve the issue of whether the statements obtained after a lawful arrest must be excluded as the fruits of law enforcement officer misconduct.

The Fifth Circuit's decision in *Webster*, 750 F.2d 307, also makes clear that the initiation of a conversation with law enforcement officers is not an intervening act of free will sufficient to purge the taint of an illegal arrest. In *Webster*, the defendant was illegally arrested and made a confession shortly thereafter that the district court had found must be suppressed. Several hours after the initial statement, the defendant was transported to another jail in a police car. While en route, the defendant initiated conversation, telling the detective that he wanted to talk. The defendant then made a statement after arriving at the jail. Even though this second statement was made twelve hours after the illegal arrest and ten hours after the first tainted confession, the court held that the statement must be excluded as the fruit of an illegal arrest. The court rejected the state's argument that the defendant's initiation of a conversation with the officer, coupled with the car ride to another jail, was a sufficient intervening act of free will. 750 F.2d at 324–25. A similar result is compelled here. Like the defendant in *Webster*, McCurdy "was in continuous custody, did not consult with a lawyer, was not able to contact family or friends, was not brought before a neutral magistrate, [and] had likely been without sleep for a long period." 750 F.2d at 325. In light of these facts, McCurdy's statement to deputy Goth must be suppressed as the fruit of his illegal arrest.

 McCurdy's statements that were not made in response to interrogation may not be suppressed, however. *United States v. Houle*, 620 F.2d 164, 166 (8th Cir.1980). It is true that the statements would not have been made "but for" the illegal arrest. However, not every statement that is causally linked to an illegal arrest must be suppressed, but only statements that are obtained by the "exploitation" of illegal conduct. *Brown*, 422 U.S. at 599, 603, 95 S.Ct. at 2261. When the law enforcement officers question a suspect after an illegal arrest, they undoubtedly know that the pressures of custodial confinement may induce the suspect to waive

his rights and make a statement. Such questioning therefore clearly exploits the illegal arrest, even if the statements obtained are ultimately found to be voluntary for Fifth Amendment purposes. Excluding such statements therefore eliminates a major incentive for making illegal arrests. When a suspect volunteers a statement absent the pressures of interrogation, however, it is far less clear that the law enforcement officers have actively exploited the illegal arrest. In such a case, "the illegal arrest merely provides the occasion of initial contact between the police and the accused," and the deterrent effect of excluding such a statement is doubtful. *Brown*, 422 U.S. at 610, 95 S.Ct. at 2265 (Powell, J., concurring in part).

## VIII. *Conclusion*

Giving consideration to the foregoing, defendants' motion to suppress the evidence seized shall be granted in a separate order issued concurrently herewith. Furthermore, defendant McCurdy's motion to suppress the statement regarding the value of the phenylacetic acid shall also be granted; but in all other respects, defendant McCurdy's motion to suppress the statements made to Deputy Goth shall be DENIED.