UNITED STATES of America,
Plaintiff,

v.

1. Ulises ARGUETA–MEJIA,
Defendant.

Criminal Action No. 13–cr–0379–WJM

United States District Court,
D. Colorado.

Signed May 27, 2014

───────

Geoffrey Rieman, Robert Mark Russel, U.S. Attorney's Office, Denver, CO, for Plaintiff.

Scott Thomas Varholak, Office of the Federal Public Defender, Denver, CO, for Defendant.

## ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS

William J. Martínez, United States District Judge

Defendant Ulises Argueta–Mejia is charged in a one-count Indictment with unlawful re-entry in violation of 8 U.S.C. § 1326(a), and is subject to an enhanced penalty pursuant to § 1326(b)(2) because his prior deportation was subsequent to a conviction for an aggravated felony offense. (ECF No. 1.) On December 19, 2013, Defendant filed a Motion to Suppress Evidence and Statements ("Motion"). (ECF No. 18.) The Court held an evidentiary hearing on April 18, 2014, and supplemental briefs were filed thereafter. (ECF Nos. 34, 36 & 39.) For the reasons set forth below, the Motion is granted.

## I. LEGAL STANDARD

The Fourth Amendment to the U.S. Constitution provides, in relevant part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." However, "[t]he Amendment says nothing about suppressing evidence obtained in violation of this command. That rule–the exclusionary rule–is a prudential doctrine created by th[e Supreme] Court to compel respect for the constitutional guaranty." *Davis v. United States,* 564 U.S. 229, 131 S.Ct. 2419, 2426, 180 L.Ed.2d 285 (2011) (internal citations and quotation marks omitted). Pursuant to the exclusionary rule, a defendant may move for suppression of evidence obtained in violation of the Fourth Amendment. *Id.*

 As will be more fully discussed below, it is undisputed that Denver Police Officer Martin Tritschler did not have a warrant when he initially stopped the Defendant. On a motion to suppress evidence obtained during a warrantless seizure, the Government bears the burden of proving the reasonableness of the seizure. *See, e.g., United States v. Maestas,* 2 F.3d 1485, 1491 (10th Cir.1993) ("As a general matter, if the search or seizure was pursuant to a warrant, the defendant has the burden of proof; but if the police acted without a warrant the burden of proof is on the prosecution.... [Thus,] when the defendant challenges a warrantless search or seizure the government carries the burden of justifying the agents' actions.") (internal quotations omitted); *see also United States v. Herrera,* 444 F.3d 1238, 1242 (10th Cir.2006); *United States v. Bute,* 43 F.3d 531, 534 (10th Cir.1994); *United States v. Finefrock,* 668 F.2d 1168, 1170 (10th Cir.1982). Thus, the Government bears the burden of proving the reasonableness of the seizure in this case.

## II. FACTUAL AND PROCEDURAL BACKGROUND

This case arises out of a traffic stop on September 4, 2013, following which the Defendant was identified as being in the United States unlawfully. (ECF No. 18.) At the suppression hearing, the following witnesses testified: (1) Denver Police Department Officer Martin Tritschler, (2) Immigrations and Customs Enforcement ("ICE") Agent Guadalupe Rodriguez, and (3) Defendant Ulises Argueta. In this sec-

tion, the Court will summarize the testimony of these witnesses. The Court's findings regarding the witnesses' credibility will be set forth in the analysis section.

## A. Officer Tritschler

Officer Martin Tritschler is a 20–year veteran of the Denver Police Department and is currently assigned to the gang unit. On September 4, 2013, he was on patrol in a marked police cruiser. Right around midnight, Officer Tritschler was driving eastbound on 38th Street and stopped at a red light at the intersection of 38th Street and Federal Boulevard. He was in the lane closest to the left turn lane.

As the light turned green for the left turn lane, Officer Tritschler noticed that one of the vehicles did not have its left turn signal activated, despite the law requiring the driver to do so. Officer Tritschler also observed that the same vehicle turned into the outside lane on Federal Boulevard, rather than the inside lane (as required by law). Based on these traffic infractions, Officer Tritschler initiated a traffic stop. He pulled his cruiser behind the vehicle and turned on his lights and sirens. The vehicle pulled to the side of the road, and Officer Tritschler ran the vehicle's license plates through his Mobile Data Terminal (MBT), which is essentially a laptop mounted in his police cruiser. The MBT did not return any warrants for the vehicle.

Officer Tritschler then approached the vehicle and obtained a driver's license, insurance, and registration from the driver. He confirmed that the individual on the license, Ulises Argueta, was the same person as the driver, and returned to his cruiser to run the license through the MBT.[1] Officer Tritschler received a "hit"

on Mr. Argueta's license from the National Crime Information Center ("NCIC") database stating: "SUBJECT OF NIC/N420453406 IS A PREVIOUSLY DEPORTED FELON. CONTACT LESC AT (877) 999–5372 FOR IMMEDIATE HIT CONFIRMATION AND AVAILABILITY OF BUREAU OF IMMIGRATION AND CUSTOMS ENFORCEMENT DETAINER." (Gov't Ex. 3.) Officer Tritschler then went back to the Defendant's vehicle and asked for his social security number to ensure that the Defendant was the actual person named in the NCIC hit. The social security number provided by the Defendant matched the information in the hit.

Officer Tritschler then called the number listed in the hit to see if ICE wanted him to detain the Defendant. ICE asked Officer Tritschler to hold the Defendant, so Officer Tritschler placed the Defendant under arrest. Officer Tritschler testified that, per Denver Police Department's policy, officers are not permitted to arrest individuals if the only charge is an immigration violation. Therefore, the only reason Officer Tritschler arrested the Defendant was because of the NCIC hit and ICE's instruction that the Defendant should be detained. He testified that the traffic infractions that were the reason for his traffic stop were not severe enough to merit an arrest. Had there been no NCIC hit, or if ICE would not have wanted the Defendant detained, Officer Tritschler would have let the Defendant go with a warning.

Once the Defendant was arrested, Officer Tritschler transported him to the Denver Police Department substation at 47th and Pecos. Officer Tritschler testified

---

1. The MBT returns reports from four databases: (1) the National Crime Information Center, which is for federal warrants; (2) the Colorado Crime Information Center, which

contains state warrants; (3) the Department of Motor Vehicle Registration Listing; and (4) the Denver Police Department's Record Management System.

that the substation was about a five minute drive from the site of the traffic stop, and that ICE officials arrived at the substation almost immediately after Officer Tritschler and the Defendant arrived. Officer Tritschler turned Defendant over to the ICE officials and went back out on patrol. He never issued a citation to the Defendant for failure to signal a turn or turning into the outside lane because he assumed the Defendant was going to face felony immigration charges so he did not see any point in issuing a traffic ticket. Officer Tritschler testified that, because he did not issue a citation or warning, the only record of this stop would have been in his log book, which is a log of what he does on patrol each day. Officer Tritschler did not bring his log sheet to the hearing, and it has never been produced to the Defendant.

On December 22, 2013, at the request of counsel for the Government, Officer Tritschler prepared a report regarding the traffic stop at issue here (the "Report"). (Def.'s Ex. B.) The Report states that the Defendant was stopped for changing lanes without signaling; there is no mention of a failure to use a turn signal during the left turn. (*Id.*) The Report also states that, after he contacted the Defendant and obtained his driver's license:

> I returned to my cruiser and ran his information via the MDT and found he had a Felony Immigration Hold that was active in the system. The name, description and social security number provided on the warrant all matched up to what I observed of him, the warrant and his ID. At one point I recontacted him and verified his social security number. At that point I took him into custody without incident. I explained to him about the warrant and I believe he said something like, "Yeah, I know." I didn't advise him of his Miranda rights and so didn't question him at all about that. We did have a conversation about the

car as I needed to impound it with his arrest.

> I took him to a nearby station—District 1–1131 W 46th Ave—and when the ICE agents arrived—turned him over to them. I didn't want to "stack" charges or something, so I just advised Argueta of the traffic violations on the scene and didn't write him a ticket for them.

(*Id.*)

## B. Guadalupe Rodriguez

The second witness for the Government was Guadalupe Rodriguez, a deportation officer for ICE since 2007. She first testified generally about ICE's procedures for arresting an individual in the field. ICE procedures dictate that an agent interview the subject to obtain basic identification evidence. If the subject admits that he or she is an alien and does not have the proper documents to allow them to be in the United States, the subject is arrested and transported to the ICE office for processing. At the ICE office, the subject's personal items are removed and inventoried, and the agent starts the "booking process". The booking process involves obtaining basic biographical information and inputting it into the ICE system. The subject is advised about free or low-cost attorneys, and provided a national detainee handbook.

The subject is then fingerprinted on a digital machine in the ICE office, and the fingerprints are run through two databases, one belonging to ICE and the other maintained by the Federal Bureau of Investigation. If there is a positive match, the ICE agent will receive the subject's criminal history, which includes the subject's immigration history, as well as his name, date of birth, and country of birth. If that information confirms that the subject is not authorized to be in the United States, the ICE agent will read the subject

his *Miranda* rights and obtain a sworn statement. The agent then fills out the necessary administrative forms to complete the case.

Agent Rodriguez next testified about the events pertinent to this case. In the early hours of September 5, 2013, Agent Rodriguez was at home asleep while on call for ICE. Around 1:00 a.m., she received a call from her supervisor stating that a subject on ICE's warrant system had been detained by the Denver Police Department, and that she was to go take custody of him. Agent Rodriguez picked up her partner and went to the substation where Defendant was being held. While en route, she received an executed I–25, which is a warrant of removal that contains a fingerprint and photograph of the subject.

Agent Rodriguez and her partner arrived at the police substation around 2:00 a.m. The agents questioned the Defendant, and he stated that he was from El Salvador. He admitted that he did not have any documents allowing him to be in the United States legally, so they took him into custody and transported him to the ICE office. Once at the ICE office, the agents followed the booking procedures previously described, including fingerprinting the Defendant. She ran his fingerprints through the databases, and printed out the results for his A-file.[2] The Defendant gave a statement, but then invoked his *Miranda* rights and the interview stopped.

Agent Rodriguez testified that, prior to getting a call from her supervisor, she had no idea that the Defendant was residing in the United States. There was no open investigation related to the Defendant or any active warrant for his arrest. In fact, at the time the agents took the Defendant into custody, they were operating solely

based on the orders from his prior deportation; no new documents had been issued and the prior orders had not been reinstated.

## C. Ulises Argueta

The final witness at the evidentiary hearing was the Defendant. He testified that on September 4, 2013, he was stopped at a red light in the left turn lane at the intersection of 38th and Federal with his left turn signal activated. He was speaking to his mother on his cellular telephone in Spanish, and he noticed a police patrol car pull into the lane next to him. The driver, Officer Tritschler, looked directly at the Defendant. When Defendant's lane got the green arrow, he proceeded with caution into his turn.

The Defendant testified that he distinctly remembers turning into the lane closest to him (the western-most lane or inner-lane of northbound Federal), because another car was coming towards him on 38th Street with its right turn signal activated. Defendant proceeded cautiously because he did not know whether the oncoming vehicle was going to stop, or whether it was going to turn into the Defendant's far lane (the eastern-most lane of northbound Federal). The Defendant was concerned that, if the oncoming car did not stop and the Defendant turned into the outside lane, he would collide with that car.

Defendant remained in the inner-lane on Federal Avenue until he noticed that the police officer had pulled behind him and activated his lights and sirens. Defendant then looked in his mirrors, made sure there wasn't a vehicle in the lane next to him, moved into the outside lane at that point, and then pulled over to the curb and stopped. The Defendant testified that,

**2.** ICE maintains a file of all immigration related documents, which is referred to as an "A-file".

when Officer Tritschler approached his vehicle, he informed the Defendant that he was pulled over because his taillight was burned out. Defendant claims that Officer Tritschler never mentioned a failure to use a turn signal or any infraction involving turning into an improper lane.

## D. Procedural History

On September 23, 2013, the grand jury returned a one-count Indictment charging Defendant with being found in the United States after previously being deported in violation of 8 U.S.C. § 1326(a). (ECF No. 2.) The Indictment also alleged that the enhanced penalty provisions of § 1326(b)(2) applied because Defendant's prior deportation was subsequent to a conviction for an aggravated felony offense. (*Id.* at 2.)

On December 19, 2013, Defendant filed the Motion arguing that the September traffic stop was conducted in violation of the Defendant's Fourth Amendment rights, because the Defendant denies that he committed any traffic violation. (ECF No. 18 at 3.) Defendant seeks exclusion of all identifying information (such as fingerprints taken following the arrest), all statements made by himself and the officer during and after the arrest, the agents' identification of the Defendant, and any and all other evidence, including Defendant's A-file. (*Id.* at 1.) The Government opposes the Motion, arguing that the stop was lawful and that, even if it were unlawful, the Defendant's fingerprints and other identifying information, including his A-file, should not be suppressed. (*Id.* at 3–5.)

The Court held a status conference on January 22, 2014 to discuss the issues raised in the Motion, including whether a hearing on the Motion was necessary. (ECF No. 26.) Following the discussion at the conference, the Court set a deadline for the parties to file a notice indicating whether the case could be resolved by plea or otherwise. (ECF No. 26.) The parties' February 21, 2014 Status Report stated that they were not able to reach a resolution, and the Court set the April 18, 2014 evidentiary hearing. (ECF Nos. 27 & 28.)

On March 21, 2014, Defendant filed a supplement to the Motion, which argues that Defendant's arrest was unlawful because Officer Tritschler did not have the authority to execute an arrest for an immigration violation. (ECF No. 31.) The Government filed its response to this newly raised issue on April 4, 2014. (ECF No. 32.)

Following the receipt of evidence at the April 18, 2014 evidentiary hearing, the Court heard oral argument on the Motion and the Defendant's supplement. Given the significant issues raised therein, the Court ordered the parties to submit a second round of supplemental briefs, which were filed by the Government on April 25, 2014 (ECF No. 36), and by the Defendant on April 30, 2014 (ECF No. 39). This matter is now ripe for review.

## III. ANALYSIS

The Motion raises three issues: (1) whether the initial traffic stop was justified; (2) whether Defendant's arrest was unlawful because Officer Tritschler lacked authority to arrest Defendant for an immigration offense; and (3) if the arrest was unlawful for either of the two prior reasons, what evidence can be suppressed as fruit of the poisonous tree. The Court finds it unnecessary to address whether the initial stop was lawful because, as set forth below, it finds that the Government has not met its burden of showing that the arrest was lawful. Thus, the Court will address only the second and third issues raised by the parties.

## A. Officer Tritschler's Authority to Arrest the Defendant

In his Supplement to the Motion to Suppress, Defendant argues that his arrest was unlawful because Officer Tritschler lacked the authority to arrest him for an immigration offense. (ECF No. 31 at 3–5.) In response, the Government contends that the arrest was justified by 8 U.S.C. § 1357(g), because Officer Tritschler was assisting federal immigration officers. (ECF No. 32 at 2–5.)

■ Section 1357 of Title 8 sets forth the powers of immigration officers and employees. When no federal arrest warrant exists for a particular individual, as in this case, federal immigration authorities may arrest that person "only where the alien is likely to escape before a warrant can be obtained." *Arizona v. United States,* —— U.S. ——, 132 S.Ct. 2492, 2506, 183 L.Ed.2d 351 (2012) (internal quotation omitted). However, this Defendant was not arrested by a federal immigration agent; Officer Tritschler is a Denver Police Officer. "Federal law specifies limited circumstances in which state officers may perform the functions of an immigration officer." *Id.* at 2506. Section 1357(g) regulates the "[p]erformance of immigration officer functions by State officers and employees". The majority of the provisions in § 1357(g) apply only where there is an agreement between the Attorney General and the political subdivision which employs the officer. *See* 8 U.S.C. § 1357(g)(1)–(9). It is undisputed that Denver does not have such an agreement with the Attorney General and, therefore, these provisions do not apply.

Instead, the Government contends that Officer Tritschler's actions were justified under Section 1357(g)(10), which states:

Nothing in this subsection shall be construed to require an agreement under this subsection in order for any officer or employee of a State or political subdivision of a State—

(A) to communicate with the Attorney General regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States; or

(B) otherwise to cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States.

Specifically, the Government contends that Officer Tritschler was "cooperating" with the Attorney General when he arrested Defendant. (ECF No. 32 at 3.)

In *Arizona,* the Supreme Court struck down § 6 of S.B. 1070, which allowed a state officer to arrest a person without a warrant "if the officer has probable cause to believe ... [the person] has committed any public offense that makes [him] removable from the United States." 132 S.Ct. at 2505–07. The state argued that this subsection allowed it to arrest a removable alien, contact federal immigration authorities, and follow their lead as to what to do next. *Id.* at 2516 (Scalia, J., concurring in part and dissenting in part). While Justice Scalia agreed with Arizona that this approach would not violate federal law, the majority of the Justices disagreed.

The majority noted that "[a]s a general rule, it is not a crime for a removable alien to remain present in the United States." *Id.* at 2505. The Court recited the federal law governing when a removable alien can be arrested, including the fact that a warrantless arrest could occur only when the alien was likely to escape before a warrant could be procured. *Id.* at 2506. It then held:

There may be some ambiguity as to what constitutes cooperation under the federal law; but no coherent under-

standing of the term would incorporate the unilateral decision of state officers to arrest an alien for being removable absent any request, approval, or other instruction from the Federal Government. The Department of Homeland Security gives examples of what would constitute cooperation under federal law. These include situations where States participate in a joint task force with federal officers, provide operational support in executing a warrant, or allow federal immigration officials to gain access to detainees held in state facilities. See Dept. of Homeland Security, Guidance on State and Local Governments' Assistance in Immigration Enforcement and Related Matters 13–14 (2011), online at http://www.dhs.gov/files/resources/immigration.shtm (all Internet materials as visited June 21, 2012, and available in Clerk of Court's case file). State officials can also assist the Federal Government by responding to requests for information about when an alien will be released from their custody. See § 1357(d). But the unilateral state action to detain authorized by § 6 goes far beyond these measures, defeating any need for real cooperation.

*Id.* at 2507. Thus, whether Officer Tritschler's arrest of the Defendant was authorized by § 1357(g)(10) depends on the degree to which Officer Tritschler was "cooperating" with ICE at the time of the arrest.

■ Officer Tritschler testified that he contacted ICE officials after receiving the hit on Defendant from the NCIC database and that ICE instructed him to hold the Defendant. If credited, this testimony would suggest that the arrest was lawful because Officer Tritschler would have been cooperating with federal immigration authorities. However, for the reasons that follow, the Court does not credit this testimony.

Officer Tritschler's justification for initiating the traffic stop of the Defendant has been inconsistent. The Defendant testified that Officer Tritschler informed him, at the time of the stop, that the reason he was pulled over was a non-working tail light. During his direct examination, Officer Tritschler testified that he witnessed the Defendant fail to use his turn signal while making the turn[3], and then turn directly into the outside lane. On cross-examination, Officer Tritschler changed his testimony, stating that the Defendant did not turn directly into the outside lane, but had turned into the proper (inside) lane and then immediately—without signaling or waiting the necessary distance—changed lanes. The Report states only that Officer Tritschler observed the Defendant make a left turn and then immediately change lanes without signaling.

Officer Tritschler's lack of detailed memory is not surprising, as the Report was prepared more than three months after the stop, and his testimony at the hearing was more than six months after the stop. Officer Tritschler testified that there was nothing notable or memorable about his interaction with the Defendant, and also testified that, during the time between the stop and the evidentiary hearing, he conducted hundreds of similar traffic stops. Thus, the Court finds that the shifting explanations for the basis of the stop show that Officer Tritschler does not

**3.** After the evidentiary hearing, the Government submitted evidence in an attempt to show that Officer Tritschler could have witnessed the fact that the Defendant's left turn signal—which was on the opposite side of the vehicle from Officer Tritschler—was not activated. The Court has not considered this evidence, both because it was untimely, and because the Court's finding regarding the legality of the seizure does not depend on the validity of the basis for the stop.

likely remember the details of this incident.

The Report completed by Officer Tritschler much closer in time to the actual event goes into significant detail about various aspects of the traffic stop, yet it is completely silent as to when Officer Tritschler contacted ICE. As Officer Tritschler testified that his communication with ICE was the only reason he arrested the Defendant, the Court finds it remarkable and noteworthy that this conversation is omitted entirely from the Report. The fact that there is no mention in the Report of Officer Tritschler calling ICE before arresting the Defendant is a significant factor in the Court's finding that there was no such communication.

The Court also bases its finding regarding the unreliability of Officer Tritschler's testimony on the inconsistencies in the timing of when each event occurred. Officer Tritschler testified that he stopped Defendant's vehicle around midnight, and that he received the NCIC hit about fifteen minutes later. He then testified that he immediately called ICE and, on their instructions, arrested the Defendant and transported him to the police substation that was approximately five minutes away. Officer Tritschler testified that ICE agents arrived at the substation almost immediately thereafter. Based on Officer Tritschler's testimony, the ICE agents would have arrived at the substation sometime between 12:30 a.m. and 1:00 a.m.

On the other hand, Agent Rodriguez testified that she did not receive the call from her supervisor informing her that the Defendant had been arrested by Officer Tritschler until around 1:00 a.m. She testified that she did not arrive at the substation until around 2:00 a.m., and that she took custody of the Defendant at that point.

While it is possible that Officer Tritschler called ICE shortly after midnight and spoke with Agent Rodriguez's supervisor, and that the supervisor waited nearly an hour to contact Agent Rodriguez with instructions to go pick up the Defendant, the Court finds this scenario highly unlikely. The Government failed to explain the inconsistencies in the timing of events or introduce any evidence from the ICE official who spoke with Officer Tritschler and/or Agent Rodriguez. The Government also failed to produce Officer Tritschler's log, which could have supported his claim that he contacted ICE prior to arresting Defendant.

■ Given the unreliability of Officer Tritschler's memory regarding the stop, coupled with his failure to mention any pre-arrest contact with ICE in his Report and the timing of when Agent Rodriguez was contacted by her supervisor, the Court finds that Officer Tritschler arrested the Defendant prior to speaking with ICE officials. The Court must next determine whether, given this finding, the arrest was permissible under the Fourth Amendment.

As previously noted, the Government contends that Officer Tritschler was cooperating with federal officials when he arrested the Defendant, and that, based on this cooperation, the arrest was lawful under § 1357(g)(10). However, the Supreme Court has said that cooperation under § 1357(g)(10) does not encompass a police officer arresting an individual, and then later contacting federal authorities. *Arizona*, 132 S.Ct. at 2506. Thus, based on the Court's factual findings regarding the sequence of events, Officer Tritschler's arrest of the Defendant was not justified under § 1357(g)(10). As this is the only justification cited by the Government for the lawfulness of the arrest[4], the Court

---

4. Notably, there is a separate provision in Chapter 8–Section 1252c(a)—which permits local law enforcement officers to arrest an individual suspected of being illegally present in the United States after having been deport-

finds that the Government has not met its burden of establishing the lawfulness of this warrantless arrest. Accordingly, the Court concludes that Officer Tritschler violated the Defendant's right to be free from unlawful seizure.

## B. Fruit of the Poisonous Tree

■■■ Because the Court has found that the seizure of the Defendant was unlawful, it must suppress all evidence that is the fruit of the poisonous tree. *See Wong Sun v. United States*, 371 U.S. 471, 485, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). To suppress evidence as fruit of the poisonous tree, a defendant must show a factual nexus between the illegality and the challenged evidence. *Id.* Ordinarily, the Government can avoid suppression of such evidence if it proves that the evidence does not suffer from the taint of the unlawful conduct. *See United States v. Nava–Ramirez*, 210 F.3d 1128, 1131 (10th Cir.2000). The Government does this by demonstrating that the evidence would have been inevitably discovered, was discovered through independent means, or was so attenuated from the illegality as to dissipate the taint of the unlawful conduct. *Wong Sun*, 371 U.S. at 488, 83 S.Ct. 407.

Defendant seeks exclusion of all identifying information (such as fingerprints taken following the arrest), all statements made by himself and the officer during and after the arrest, the ICE agents' identifica-tion of the Defendant, and any and all other evidence, including Defendant's "A-file". (ECF No. 18 at 1.) The Motion argues that, but for the unlawful stop, the Government would not have any of the Defendant's identifying information or his statements and, therefore, all of this evidence is fruits of the poisonous tree. (*Id.* at 6–7.) The Court finds that the Defendant has established a nexus between the unlawful seizure and the evidence, given that Defendant would not have been in contact with ICE—who took his fingerprints and pulled his A-file—if Officer Tritschler had not arrested him.

Thus, the Court must examine whether the Government has shown that the evidence is sufficiently attenuated from the unlawful seizure such that it need not be suppressed. The Government contends that the Defendant's fingerprints and A-file should not be suppressed because they were obtained as part of a routine booking process. (ECF No. 36 at 12–13.) Whether a defendant's identity can be suppressed, including fingerprints and immigration-related files, is a difficult question. Based on varying interpretations of *I.N.S. v. Lopez–Mendoza*, 468 U.S. 1032, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984), there is a distinct split between the circuits on whether identification evidence can ever be suppressed.[5] However, as is relevant for this Court's purposes, and as set forth

---

ed following a felony conviction. However, the Government does not rely on this provision to justify the arrest of this Defendant. Though the Government does not explain why it does not reference § 1252c, it is likely because this section only authorizes such arrest if it is "permitted by relevant State and local law." *See* 8 U.S.C. § 1252c(a). It is undisputed that Denver Police Department regulations did not permit Officer Tritschler to arrest the Defendant solely because of his immigration status. (See ECF No. 31 at 6 (citing Denver Police Operations Manual § 104.52).)

5. *Compare Pretzantzin v. Holder*, 736 F.3d 641 (2d Cir.2013) (interpreting *Lopez–Mendoza* as merely reiterating long-standing jurisdictional rule), *United States v. Guevara–Martinez*, 262 F.3d 751 (8th Cir.2001) (same), and *United States v. Oscar–Torres*, 507 F.3d 224 (4th Cir. 2007) (same), with *United States v. Bowley*, 435 F.3d 426 (3d Cir.2006) (interpreting *Lopez–Mendoza* as barring suppression of evidence of identity), *United States v. Navarro–Diaz*, 420 F.3d 581 (6th Cir.2005) (same), and *United States v. Roque–Villanueva*, 175 F.3d 345 (5th Cir.1999).

below, the Tenth Circuit has held that certain identification evidence *can be* suppressed.

In *United States v. Olivares–Rangel,* 458 F.3d 1104 (10th Cir.2006), the Tenth Circuit held that, after *Lopez–Mendoza*: "A defendant may still seek suppression of specific pieces of evidence (such as, say, fingerprints or statements) under the ordinary rules announced in *Mapp* [*v. Ohio,* 367 U.S. 643, 648, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) (requiring suppression of any evidence obtained during illegal police conduct)] and *Wong Sun." Id.* at 1111. However, evidence that is obtained "as part of a routine booking or processing procedure", including fingerprints or booking photos, can only be suppressed if the illegal arrest was "purposefully exploited for the objective of obtaining fingerprints." *Id.* at 1115–16. "[I]n the absence of evidence that the illegal arrest was purposefully exploited for investigatory objectives, fingerprints taken as part of a routine, booking procedure are not fruit of a poisonous tree." *Id.* This determination depends on "[t]he precise circumstances under which Defendant was arrested and his fingerprints taken." *Id.* at 1116.

The parties acknowledge that *Olivares–Rangel* governs this Court's determination as to whether Defendant's fingerprints and A-file should be suppressed. The Government bears the burden of introducing evidence to show that Defendant's fingerprints were obtained as part of a routine booking process rather than for the purpose of comparing them to his immigration file or prior criminal record for purposes of this prosecution. *United States v. Meza,* 2014 WL 201598, at *2 (D.Colo. Jan. 17, 2014). To meet this burden, the Government elicited the testimony from Agent Rodriguez regarding ICE's routine booking procedures, including the fact that she followed these procedures while booking the Defendant for the immigration violations charged in this case. The Government argues that this evidence is sufficient to show that the Defendant's fingerprints, and the A-file obtained by running those fingerprints through ICE's database, should not be suppressed. (ECF No. 20 at 5–6.)

In response, the Defendant argues that the exception for evidence obtained during a routine booking process does not apply here because the booking process which produced the fingerprints and A-file was for the immigration offense charged. (ECF No. 39 at 16–17.) The Court agrees. The purpose of the exclusionary rule is to prohibit exploitation of an unlawful detention. *See United States v. Guevara–Martinez,* 262 F.3d 751, 755 (8th Cir.2001). In *United States v. Perez–Partida,* 773 F.Supp.2d 1054 (D.N.M.2011), the court parsed *Olivares–Rangel* and the cases from other circuits, and concluded that fingerprints obtained as part of a routine booking procedure were not subject to suppression only if the Government could show both: "(1) that the initial arrest and search were not conducted in part for the purpose of obtaining evidence of Defendant's identity to establish his unlawful presence in the United States; and (2) that the [law enforcement officials who obtained the fingerprints] did not exploit the Defendant's arrest for the purpose of obtaining his fingerprints." *Id.* at 1065.

The undisputed evidence in this case shows that the only reason the Defendant was arrested was because he was a previously deported felon, which is an immigration offense. The booking process at issue here was performed by ICE, an agency whose entire purpose is to enforce the country's immigration laws. Agent Rodriguez testified that the purpose of the booking process was to obtain the Defendant's fingerprints so that she could verify

his status as a previously deported felon. All of these factors show that the fingerprints were obtained to further the investigation of the immigration offense, and that the unlawful arrest was exploited for the purpose of obtaining the fingerprints. *See Guevara–Martinez*, 262 F.3d at 756 (fingerprints taken by immigration officials after interviewing the subject were for the purpose of assisting the immigration investigation). Thus, the Government has failed to meet its burden of showing that the fingerprints and resulting A-file must be suppressed a fruits of the poisonous tree. *See id.*(fingerprints obtained by immigration officials following an unlawful arrest are fruits of the poisonous tree); *United States v. Rodriguez–Martinez*, 2009 WL 9119964, at *7 (D.Colo. Feb. 20, 2009) (same).

## C. Good Faith Exception

■ The Government also argues that, under the good faith exception, the Defendant's identifying information should not be suppressed because doing so would not further the purposes of the exclusionary rule. (ECF No. 32 at 5–7.) Specifically, the Government contends that Agent Rodriguez—who took Defendant's fingerprints and generated his A-file—had no way of knowing whether Officer Tritschler's arrest of the Defendant was lawful and, therefore, excluding the evidence she obtained would not meaningfully deter police misconduct. (*Id.*)

The Court has reviewed the cases cited by the Government and finds that they do not establish that the good faith exception would be applicable to the circumstances of this case. These cases stand for the proposition that evidence should not be excluded when it results from a search arising from a search warrant issued by a judicial officer or a statute passed by the legislature. *See United States v. Leon*, 468 U.S. 897, 915, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) (refusing to exclude

evidence obtained during a search authorized by a judicially-issued search warrant); *Illinois v. Krull*, 480 U.S. 340, 350, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987) (evidence obtained during a search authorized by a statute that was later declared unconstitutional was not subject to suppression). The Supreme Court has also held that warrants issued based on administrative or police error did not subject evidence to suppression. *See Arizona v. Evans*, 514 U.S. 1, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995) (evidence obtained as a result of an invalidly issued arrest warrant need not be suppressed because the error by courthouse staff was unintentional); *Herring v. United States*, 555 U.S. 135, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009) (arrest warrant issued based on error in police record-keeping system did not merit exclusion of evidence).

In this case, the Court need not decide whether Officer Tritschler's unlawful arrest of Defendant was intention or whether he simply misunderstood his authority to effect the arrest upon receipt of the NCIC hit. Even if the Court assumes that Officer Tritschler was mistaken, the Government has failed to cite any cases extending the good faith exception to cover this situation. All of the cases cited by the Government involve a law enforcement officer's reasonable reliance on someone else's error, *e.g.,* the judicial officer that issued a search warrant when there was no probable cause or the legislature that passed an unconstitutional statute. *See Leon*, 468 U.S. at 915, 104 S.Ct. 3405; *Krull*, 480 U.S. at 350, 107 S.Ct. 1160. These cases do not stand for the proposition that the good faith exception applies when the legal error is committed by the same law enforcement officer that effectuated the arrest. *See United States v. McQuagge*, 787 F.Supp. 637, 651 (E.D.Tex.1991) (good faith exception does not apply to officers

who mistakenly believed there was probable cause to arrest a defendant).

The Court finds that no reasonable law enforcement official in Officer Tritschler's position could believe that his arrest of the Defendant prior to contacting ICE was permissible. Denver Police Department regulations plainly state that its police officers "will not detain, arrest, or take enforcement action against a person solely because he/she is suspected of being an undocumented immigrant." (ECF No. 31 at 6.) Given this clear policy, no reasonable officer in Officer Tritschler's position would have believed he had the authority to arrest the Defendant. This conclusion is further supported by the fact that Officer Tritschler actually testified that he did not have the authority to arrest someone if their only suspected offense was immigration related. Thus, the Court finds that the Government has not shown that Officer Tritschler reasonably, and in good faith, believed that he was authorized to arrest the Defendant before he contacted ICE. *See United States v. Lopez–Valdez*, 178 F.3d 282, 289 (5th Cir.1999) (refusing to apply the good faith exception where no reasonable officer could believe that there was cause to arrest the defendant).

■ Finally, the Court finds that the purpose of the exclusionary rule would be satisfied by suppressing the evidence in this case. Law enforcement officials have a duty to understand their authority to arrest individuals for various offenses, and this ruling will reinforce the fact that a Denver police officer must be acting in cooperation with a federal official in arresting a subject on suspicion of an immigration offense. *See United States v. McCane*, 573 F.3d 1037, 1044 (10th Cir. 2009) (one of the purposes of the exclusionary rule is to deter conduct which an officer knows or should know violates the Fourth Amendment).

In sum, the Court finds that the Defendant has shown that his Fourth Amendment rights were violated when he was arrested by Officer Tritschler, and that all of the statements and physical evidence obtained by the Government resulted from the unlawful arrest. The Court further finds that the Government has failed to show that any of the evidence is so attenuated from the unlawful activity so as to not qualify as fruits of the poisonous tree. Finally, the Court finds that the Government has failed to establish that the good faith exception applies here.

Accordingly, the Court grants the Motion and suppresses all physical evidence, including Defendant's fingerprints and A-file, as well as his statements.

## IV. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1. Defendant's Motion to Suppress Evidence and Statements (ECF No. 18) is GRANTED;

2. The following evidence may not be used by the Government in prosecution of this case:

 a. Any identifying information (including fingerprints) of the Defendant;

 b. Defendant's A-file; and

 c. Post-arrest statements made by the Defendant.

3. As all outstanding motions have now been resolved, the Court RESETS the trial of this matter. Given the requirements of the Speedy Trial Act, a 3–day jury trial is set to commence on June 16, 2014. The Final Trial Preparation Conference will be held on at 2:00 p.m. on June 11, 2014.

Dated this 27th day of May, 2014.